**Dennis Rosa COLLAZO,
Petitioner–Appellant,**

v.

**Wayne ESTELLE, Warden, California
Mens Colony, Respondent–Appellee.**

No. 88–2443.

United States Court of Appeals,
Ninth Circuit.

Argued En Banc and
Submitted Oct. 9, 1990.

Decided July 18, 1991.

William D. Farber, San Rafael, Cal., for petitioner-appellant.

Aileen Bunney, Supervising Deputy Atty. Gen., San Francisco, Cal., for respondent-appellee.

Before GOODWIN, HUG, FLETCHER, POOLE, D.W. NELSON, REINHARDT, BEEZER, KOZINSKI, NOONAN, O'SCANNLAIN and TROTT, Circuit Judges.

TROTT, Circuit Judge:

Appellant Collazo was arrested for murder and advised of his *Miranda* rights. He declined to waive them, asking instead to talk to a lawyer. The police responded to his request by telling Collazo it "might be worse" for him if he talked to an attorney, and that it was in his interest to talk to them without one. Three hours later, he "changed his mind," was readvised of his rights, and talked to the police. What he told them was used to convict him and send him to prison. We are called on in this appeal to examine the conduct of the police leading up to Collazo's confession, and to decide in light of that conduct whether Collazo was denied due process when his confession was introduced in evidence. We conclude that Collazo's confession was involuntary, and that its use to convict him violated his Constitutional rights. We reverse the district court.

I

On September 27, 1982, Dennis Collazo, an occasional informant and undercover operative for the Drug Enforcement Administration, was arrested for the murder of Douglas Metzger. Metzger often sold cocaine to Collazo's niece, who owed Metzger a considerable debt arising from her purchases. When Collazo's niece expressed a desire to free herself from her drug debt, Collazo and Tony Young, one of Collazo's confederates, attempted an armed robbery of Metzger. The robbery turned into a brawl, and Young shot Metzger. After the murder, Collazo went to Mexico (apparently on DEA business), and was arrested on his return.[1]

After the arrest, Collazo was escorted to an interview room in the San Jose Police Station where Officer Rolen fully advised

---

1. We glean the facts of this case from *People v. Collazo*, No. A031327 (Cal.4th Dist. May 21, 1986) (unpublished), from the Reporter's Transcript of Collazo's trial, and from the tape recordings of his conversation with the police.

him of his *Miranda* rights. In response, he asked to talk to his wife. The police denied this request. After some discussion about where he was on the day of the murder and another rejected request to talk to his wife, Collazo requested to talk to a lawyer. Instead of respecting his request, however, Officer Destro (Officer Rolen's partner) attempted to pressure him into dispensing with counsel and talking to them about the homicide.[2] A transcript of the conversation follows:

Collazo: Oh, you know, ah, can I, you know, talk to a lawyer?

Destro: It's up to you. This is your last chance to talk to us, though.

Collazo: I understand that.

Destro: Once you get a lawyer, he's gonna say forget it. You know, don't talk to the police. Then it might be worse for you.

Collazo: Pardon me?

Destro: Then it might be worse for you.

Collazo: Why?

Destro: Because, ah, you know, there's other people involved in this thing, and we would like to get everybody. If you don't want to talk about it, uh—

Rolen: Well, he's asked for a lawyer, so why don't we, I guess we'll end our interview right there.

Collazo: If, ah, if ah, this gonna be stupid for you, you know, for me it means a lot, you know.

Destro: If you're arrested for murder, it does mean a lot.

The police then departed, leaving Collazo in the interview room to ponder Officer Destro's inappropriate admonition and to consider whether he could afford to exercise his Constitutional rights.

Collazo was then permitted to call and to see his wife, a legal secretary. She came to the police station and had a lengthy discussion with him, the substance of which is unknown. Some three hours after the officers' departure, Collazo contacted a sergeant and asked, "Where are the investigators?" The sergeant correctly construed this as a request to talk to them, and they were so notified and returned to the station. Collazo was again advised of his *Miranda* rights, and indicated he had changed his mind and was now willing to talk. He then essentially confessed to his nonshooting role in the crimes for which he had been charged and arrested.

In state court, Collazo unsuccessfully attempted to suppress his incriminating statements on the ground that they were the product of impermissible coercion and thus a violation of his Constitutional rights. He argued that the formal waiver of his *Miranda* rights was nothing more than the involuntary product of previous threats. At trial, his taped statement, the truthfulness of which he partially repudiated, was admitted in evidence over his objection. Collazo was convicted by a jury of felony murder, burglary, and conspiracy to commit robbery, burglary, and theft. For these crimes he was sentenced to state prison for a term of 26 years to life.

Collazo pursued his case on appeal through the state courts in California, attacking his confession as the direct product of a violation of his federal Constitutional rights. He was not successful and after exhausting all state remedies, he filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of California. His petition was denied, but a certificate of probable cause was issued.

On appeal, Collazo argues (1) his confession was involuntary, (2) the alleged waiver he articulated before confessing was nothing more than the unlawful product of coercive tactics, and (3) the use of his statement against him was not harmless error.

## II

We confront a state court record containing factual findings on the relevant issues. California argues that these findings, insofar as they pertain to the validity of the alleged waiver, are entitled to the presump-

---

**2.** At oral argument, California conceded that "pressuring" is an appropriate characterization of Officer Destro's tactics.

tion of correctness mandated by 28 U.S.C. § 2254(d).[3] Therefore, we must first determine the appropriate standard of review that controls our analysis.

■ We review de novo the voluntariness of Collazo's confession. *Miller v. Fenton*, 474 U.S. 104, 112, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985), calls on us to determine "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution ...," and to do so by subjecting the issue to "plenary federal review." A federal court reviewing the admissibility of a confession is not bound by a state court finding of voluntariness and has a "duty to make an independent evaluation of the record." *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978). More specifically, we are not bound by state court findings that the conduct of the interrogating officers was not coercive. As Chief Judge Wallace recently stated in *Derrick v. Peterson*, 924 F.2d 813, 818 (9th Cir.1990), "we are obligated to conduct an independent review of the 'constitutional acceptability' of the ... interrogation...." We take a fresh look at whether the police used "objectively unacceptable methods to coerce [the defendant] into waiving his right to silence...." *United States v. Wolf*, 813 F.2d 970, 976 n. 16 (9th Cir.1987). In this regard, "the admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne." *Miller*, 474 U.S. at 116, 106 S.Ct. at 452 (emphasis in original).

Historical or subsidiary facts are treated differently, even though they may be dispositive of a Constitutional claim. *Id.* at

113, 106 S.Ct. at 451. Such findings as whether the police in fact made the alleged threats are reviewed for clear error if made by a district court, and are presumed correct under section 2254(d) if made by a state court. "To be sure, subsidiary factual questions, such as ... whether in fact the police engaged in the intimidation tactics alleged by the defendant ... are entitled to the § 2254(d) presumption [of correctness]." *Id.* at 112, 106 S.Ct. at 450 (citations omitted).

The standard of review does not change when the inquiry shifts from the voluntariness of the confession to the voluntariness of an asserted *Miranda* waiver.[4] *Colorado v. Spring*, 479 U.S. 564, 573, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987), makes it clear that "the inquiry whether a waiver is coerced 'has two distinct dimensions'":

> "First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal *both* an uncoerced choice *and* the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived."

(quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986) (emphasis added)).

■ We review the voluntariness prong de novo:

> We agree with the Third Circuit and reaffirm *Grooms'* [*Grooms v. Keeney*, 826 F.2d 883, 887 (9th Cir.1987)] adoption of a plenary standard of review because we find that the voluntariness of a waiver is a mixed question of law and

---

**3.** After listening to tapes of the interview and testimony from witnesses, the trial court found Collazo's confession was "voluntary beyond a reasonable doubt," and that there was "no taint whatsoever to his ultimate statement."

**4.** *Miller v. Fenton* left this issue open: "The present case presents no occasion for us to address the question whether federal habeas courts must accord the statutory presumption of correctness to state-court findings concerning the validity of a waiver." *Miller*, 474 U.S. at 108 n. 3, 106 S.Ct. at 448 n. 3.

fact that requires *de novo* review. A mixed question of law and fact warrants *de novo* review when "the application of law to fact will require the consideration of legal concepts and involve the exercise of judgment about the values underlying legal principles."

*Terrovona v. Kincheloe,* 852 F.2d 424, 428 (9th Cir.1988) (quoting *United States v. McConney,* 728 F.2d 1195, 1202 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984)). *See also Derrick,* 924 F.2d at 822. Thus, as with the voluntariness of a confession, the voluntariness of a *Miranda* waiver is decided by first examining objectively the methods the police used to produce the waiver.

■ But the calculus shifts when we focus on the awareness prong. In this dimension, "we review the question of whether the defendant's mind was overborne—i.e., was his waiver knowing and intelligent—for clear error." *Derrick,* 924 F.2d at 823. In the context of collateral review, "a state trial court's determination that a defendant knowingly and intelligently waived his *Miranda* rights is entitled to a presumption of correctness pursuant to section 2254(d)." *Id.*

### III

We now examine Officer Destro's response to Collazo's initial assertion of his *Miranda* rights. We must determine, as a threshold matter, whether Officer Destro's attempt to discourage Collazo from speaking to a lawyer is compatible with a system of justice that does not permit police coercion. We conclude it is not, and we so conclude for a multitude of reasons.[5]

■ First, applying the traditional Fifth Amendment voluntariness test, Officer Destro's nine terse sentences, understood plainly, were coercive. His words were

calculated to pressure Collazo into changing his mind about remaining silent, and into talking without counsel to his interrogators. Destro's warning that it "might be worse" for Collazo if he did not cooperate with the police can only be seen as menacing. During the suppression hearing, the prosecutor himself characterized Officer Destro's tone and presentation as "insistent." The tape of the interview confirms this description.

The use of coercive tactics by state law enforcement officers to pressure an arrestee into talking has been prohibited since 1936. *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936) (use of a defendant's coerced confession in a state criminal trial denies due process).[6] As the Supreme Court stated in *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961):

The ultimate test remains that which has been the only clearly established test in Anglo–American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? ... The line of distinction is that at which governing self-direction is lost *and compulsion, of whatever nature or however infused,* propels or helps to propel the confession.

(emphasis added). Twenty-eight years later, and eighteen years before the investigation in this case, the privilege against self-incrimination was held applicable to the states via the Fourteenth Amendment. *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

■ Interrogation tactics need not be violent or physical in nature to be deemed coercive. Psychological coercion is equally likely to result in involuntary statements, and thus is also forbidden. *Mincey,* 437

---

**5.** We further conclude, in Section IV, that Officer Destro's pressure on Collazo carried over to taint Collazo's subsequent waiver and confession.

**6.** *See also Spano v. New York,* 360 U.S. 315, 320–21, 79 S.Ct. 1202, 1205–06, 3 L.Ed.2d 1265 (1959) ("The abhorrence of society to the use of involuntary confessions does not turn alone on

their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.").

U.S. at 401, 98 S.Ct. at 2418, provides us with guidance:

> There were not present in this case some of the gross abuses that have led the Court in other cases to find confessions involuntary, such as beatings ... or "truth serums".... But the "blood of the accused is not the only hallmark of an unconstitutional inquisition." ... Determination of whether a statement is involuntary "requires more than a mere color-matching of cases." It requires careful evaluation of all the circumstances of the interrogation.

(citations omitted) (footnote omitted); *see also Spano*, 360 U.S. at 321, 79 S.Ct. at 1206 ("[A]s law enforcement officers become more responsible, and the methods used to extract confessions more sophisticated, our duty to enforce federal constitutional protections does not cease.").

Second, Officer Destro not only resorted generally to coercive tactics, but in doing so he effectively told Collazo he would be penalized if he exercised rights guaranteed to him under the Constitution of the United States. Notwithstanding *Miranda's* attempt to "assure that the exercise of the [Fifth Amendment right to silence] will be scrupulously honored ...," 384 U.S. 436 at 479, 86 S.Ct. 1602 at 1630, 16 L.Ed.2d 694 (1966) Officer Destro attempted to impose a penalty on its invocation. The Supreme Court has held "while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings." *Doyle v. Ohio*, 426 U.S. 610, 618, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976). *Doyle* went on to hold "the use for impeachment purposes of [an arrestee's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." *Id.* at 619, 96 S.Ct. at 2245 (footnote omitted). It follows as night the day that Officer Destro's attempt in the police station to impose a penalty on Collazo's choice to remain silent amounts to a serious infringement of Colla-

zo's Fifth Amendment right. *See also Michigan v. Tucker*, 417 U.S. 433, 442, 94 S.Ct. 2357, 2363, 41 L.Ed.2d 182 (1974) ("[I]n *Miranda* ... the privilege against compulsory self-incrimination was seen as the principal protection for a person facing police interrogation.").

Third, *Miranda* expresses concern about the compelling pressures that weigh upon a person in custody, pressures that can break a person's free will and cause that person to talk involuntarily. *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966). Here, Officer Destro took unfair advantage of these pressures. At a point where the law required him to back off, he did not "scrupulously honor" Collazo's right to cut off questioning; he stepped on it. Any minimally trained police officer should have known such pressure was improper and likely to produce involuntary statements. Thus, Officer Destro engaged in prohibited interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980), points out "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (footnote omitted).[7] *Innis* explicitly outlawed techniques likely to " 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." *Id.* at 299, 100 S.Ct. at 1688 (quoting *Miranda*, 384 U.S. at 457–58, 86 S.Ct. at 1618–19); *see also Shedelbower v. Estelle*, 859 F.2d 727, 731 (9th Cir.1988), *United States v. Gomez*, 927 F.2d 1530 (11th Cir. 1991); *United States v. Anderson*, 929 F.2d 96 (2d Cir.1991).

In this regard, Officer Destro's immediate interrogation of Collazo in direct response to his request for a lawyer is a textbook violation of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378

---

**7.** "By 'incriminating response' we refer to any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at

trial." *Innis,* 446 U.S. at 301 n. 5, 100 S.Ct. at 1690 n. 5 (emphasis in original).

(1981). *Edwards* made it clear beyond doubt that "an accused, such as [Collazo], having expressed his desire to deal with the police only through counsel, is *not* subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85, 101 S.Ct. at 1884–85 (emphasis added). At the point Officer Destro hectored Collazo, Collazo had not initiated further communication with the officers. In fact, he had terminated the exchange by asking for a lawyer. The goal of the Court in *Edwards* was "to protect an accused in police custody from being badgered by police officers . . . ," *Oregon v. Bradshaw,* 462 U.S. 1039, 1044, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983). What Officer Destro did can only be seen as badgering Collazo in the precise manner that concerned the *Edwards* Court.

Fourth, Officer Destro demeaned the pre-trial role of counsel articulated by the Supreme Court in *Miranda* and its progeny. He did so by dispensing a one-sided, unauthorized legal opinion regarding whether Collazo should remain silent and exercise his right to counsel.[8] This advice adds yet another unacceptable dimension to Officer Destro's methods. "[T]o a suspect who has indicated his inability to cope with the pressures of custodial interrogation by requesting counsel, any further interrogation without counsel having been provided will surely exacerbate whatever compulsion to speak the suspect may be feeling." *Arizona v. Roberson,* 486 U.S. 675, 686, 108 S.Ct. 2093, 2100, 100 L.Ed.2d 704 (1988). As if this were not enough, Officer Destro inappropriately led Collazo to believe he could reap some legal benefit by excluding defense attorneys from the pre-trial process. Such a tactic is inconsistent with *Miranda's* stated purpose of making "the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of per-

sons acting solely in his interest." *Miranda,* 384 U.S. at 469, 86 S.Ct. at 1625. As it turned out, and with considerable irony, not only did matters *not* go better for Collazo by talking without an attorney rather than remaining silent, but his statements were used to send him to prison, possibly for life.

Thus, Officer Destro's statements subjected Collazo to menacing custodial interrogation in violation of *Brown v. Mississippi, Culombe, Miranda, Innis,* and *Edwards.* Officer Destro's words are an egregious violation of *Miranda* —the essence of improper law enforcement behavior in response to the rules established in that the landmark case. We join with Judge O'Scannlain's dissent in characterizing this behavior as "improper and reprehensible."

California freely admits on appeal that "[t]he police violated Collazo's *Miranda* rights . . . ." What California fails to appreciate is that a breach of these rules not only has *Miranda* implications, but traditional voluntariness implications as well. Although *Miranda* "rights" are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected," *Tucker,* 417 U.S. at 444, 94 S.Ct. at 2364, when these measures are ignored, as they were in this case, a suspect's Constitutional rights are directly affected. Destro's failure to comply with *Miranda* aggravated his coercive tactics. *See Clewis v. Texas,* 386 U.S. 707, 709, 87 S.Ct. 1338, 1339, 18 L.Ed.2d 423 (1967) (*Miranda* transgressions are relevant on the issue of the voluntariness of a confession).

Returning to non-Miranda aspects of the traditional Fifth Amendment voluntariness test, we see that Officer Destro's words and tactics share much in common with other psychological ploys that have been scrutinized and found wanting. The Su-

---

**8.** Officer Destro has a First Amendment right to have any opinion he wishes of *Miranda* and lawyers, but he is not free to express it in this context. During the hearing to suppress Collazo's statements, the prosecutor made the re-

markable argument that what Destro told Collazo was true—"[A]ny defense attorney is going to tell his client not to talk to the police"—and the statement was therefore "harmless." This argument borders on the absurd.

preme Court noted in *Spring*, 479 U.S. at 576 n. 8, 107 S.Ct. at 858 n. 8:

> In certain circumstances, the Court has found affirmative misrepresentations by the police sufficient to invalidate a suspect's waiver of the Fifth Amendment privilege. See, e.g., *Lynumn v. Illinois*, 372 U.S. 528 [83 S.Ct. 917, 9 L.Ed.2d 922] (1963) (misrepresentation by police officers that a suspect would be deprived of state financial aid for her dependent child if she failed to cooperate with authorities rendered the subsequent confession involuntary); *Spano v. New York*, 360 U.S. 315 [79 S.Ct. 1202, 3 L.Ed.2d 1265] (1959) (misrepresentation by the suspect's friend that the friend would lose his job as a police officer if the suspect failed to cooperate rendered his statement involuntary).

Destro's ploy also trespasses on our holding in *United States v. Tingle*, 658 F.2d 1332, 1336 (9th Cir.1981), which condemned warnings by interrogators "that a lengthy prison term could be imposed, that [the arrestee] had a lot at stake, that her cooperation would be communicated to the prosecutor, that her failure to cooperate would be similarly communicated, and that she might not see her two-year-old child for a while...." (footnotes omitted). Writing for the panel, Judge Reinhardt held that this litany, under the circumstances, constituted psychologically coercive tactics sufficient to render Tingle's subsequent confession involuntary.

We are not unaware of the complex challenges faced by law enforcement officers as they discharge their important and difficult responsibilities in accord with Constitutional principles and the rules designed to protect them. Nevertheless, this is a nation where the rule of law prevails, where ends do not justify inappropriate means. *Miranda* has been part of our law since 1966. Most law enforcement officers abide faithfully by its requirements even though they find them on occasion to be frustrating. As long as *Miranda* is on the books, it must be respected. In this case, it was not honored. It was disobeyed.

The present case is not one where we examine interrogation practices not addressed by the courts as of the time of the interrogation. Officer Destro's improper admonition flew directly in the face of previously published rules and rights on the books for some time before Collazo's request. This disregard for established rules exacerbates the police conduct in question and it evokes Justice Brandeis' timeless dissenting remarks in *Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928):

> Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a law-breaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.

We repeat this statement not to berate Officer Destro, but to remind all law enforcement officers of the importance of their responsibilities.

Based on the foregoing, our plenary review of the tactics used by Officer Destro in an attempt to pressure Collazo into talking to his adversaries leads us to a two-part conclusion. First, Officer Destro's tactics add up to a flagrant breach of the prophylactic rules established by the Supreme Court in *Miranda* and its progeny to protect a defendant's Constitutional right against self-incrimination. Second, Officer Destro's overreaching behavior violated not only *Miranda*, but also the general Constitutional prohibition against coercive interrogation practices likely to result in involuntary responses. Officer Destro's gambit was inconsistent with Collazo's Fifth Amendment right against self-incrimination as well as his right to consult an attorney. His inquisitorial stratagem was calculated to break Collazo's will. As such, it offends

due process as guaranteed by the Fourteenth Amendment.

## IV

If Collazo had confessed to his interrogators in immediate response to Officer Destro's pressure, his confession—for the reasons previously detailed—would have been manifestly inadmissible, and our inquiry would be over. But Collazo's confession did not come until some three hours after Officer Destro's impropriety, and it was preceded by certain events to which California points in support of an argument that boils down to this proposition: By the time Collazo decided to talk, the taint of any earlier misconduct had evaporated, leaving Collazo free to decide on his own whether to "[initiate] further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 485, 101 S.Ct. at 1885.

In making this argument and in attempting to bring this case within *Edwards's* exception covering suspects who themselves initiate further discussion, California points to the following facts:

1. Collazo asked to talk to Officers Destro and Rolen; they did not make the contact, he did.

2. Collazo's request to see them came some three hours after their initial departure.

3. In the interim, Collazo had been permitted to speak privately and at length with his wife, a legal secretary.

4. Before confessing, Collazo was readvised of his *Miranda* rights and acknowledged to the police he had changed his mind and wanted to talk.

5. After he confessed, Collazo stated in response to questions from Destro that he was not acting because of any promises or threats made by the police.

California also points to various aspects of Collazo's personal background:

1. He was a mature 29 year old adult.

2. He had worked with the Drug Enforcement Administration as a undercover operative and as an informant.

3. He was personally and intimately familiar with the criminal justice system, having been arrested on previous occasions.

4. He was aware of his rights before the day of his apprehension.

In sum, California argues that the totality of the relevant circumstances and the characteristics of the confessor demonstrate that when Collazo asked to see Officers Destro and Rolen he was acting voluntarily, knowingly, and intelligently, not because of any previous compulsion. Relying on *Edwards* and *Connecticut v. Barrett*, 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987), which permits a suspect to answer some questions while refusing to answer others, California concludes that his Mirandized confession was admissible in evidence.

■ In making this argument California assumes that following a *Miranda* violation the appropriate question is the same as it is if no such violation has previously occurred—that is, did Collazo initiate the communication that led to the incriminating statements? We need not decide whether the state's view is correct, because even assuming for the sake of argument that it is, we find as explained below that Collazo's initiation of the communication leading to the second interrogation was the product of the coercive statements made by the police during the first, illegal interrogation.

California's argument fails to appreciate the evident linkage between the coercion and the confession, and it fails to accord appropriate weight to the rules that govern this inquiry. To determine whether the initial coercion tainted both Collazo's request to see his interrogators as well as his alleged waiver, we apply the traditional test for deciding whether each was voluntary, asking whether each resulted from the exercise of Collazo's free will.

■ Ordinarily, the burden of proof in this regard falls upon the state, and it must be carried by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972); *see also Colorado v. Connelly*, 479 U.S. 157 at 168, 107 S.Ct. 515 at 522, 93 L.Ed.2d

473 (1986). ("Whenever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, the State need prove waiver only by a preponderance of the evidence.")

However, "[a]s Justice White has explained, 'the accused having expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism.' " *Roberson*, 486 U.S. at 681, 108 S.Ct. at 2098 (quoting *Michigan v. Mosley*, 423 U.S. 96 at 110, n. 2, 96 S.Ct. at 321 at 329, n. 2, 46 L.Ed.2d 313 (1975) (White, J., concurring in result)). Thus, "if a suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is presumed that any subsequent waiver *that has come at the authorities' behest, and not at the suspect's own instigation,* is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect." *Roberson*, 486 U.S. at 681, 108 S.Ct. at 2097 (emphasis added). Because we conclude that Officer Destro induced Collazo's purported waiver by initially insisting that Collazo cooperate, we believe *Roberson's* warning is highly pertinent.

■ The factors that are relevant to determining the effect of previous police coercion have been spelled out in *United States v. Patterson*, 812 F.2d 1188, 1192 (9th Cir.1987). They are whether (1) there was a break in the stream of events sufficient to insulate the statement from the effect of the prior coercion, (2) it can be inferred that the coercive practices had a continuing effect that touched the subsequent statement, (3) the passage of time, a change in the location of the interrogation, or a change in the identity of the interrogators interrupted the effect of the coercion, and (4) the conditions that would have precluded the use of a first statement had been removed.

The application of these factors to the facts of the case at hand is similar to the task mandated by the Supreme Court in *Wong Sun v. United States*, 371 U.S. 471 at 487–88, 83 S.Ct. 407 at 417, 9 L.Ed.2d 441 (1963). We must determine "whether, granting establishment of the primary illegality, the evidence to which ... objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." (quoting Maguire, *Evidence of Guilt*, 221 (1959)). *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975), also provides considerable guidance: [9]

> The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on ... a talismanic test. The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant.... And the burden of showing admissibility rests, of course, on the prosecution.

(citations omitted) (footnotes omitted).

Our plenary review of the record in light of the relevant tests and the factors to be applied leads us to conclude that Collazo's alleged waiver and confession were not voluntary. Collazo testified he was scared, and that Officer Destro's threats are what caused him to change his mind and talk without counsel. The record amply supports his contentions. The day, subject matter, place of the interrogation, and in-

---

**9.** The "primary illegality" in both *Wong Sun* and *Brown* was an illegal arrest. In the present case, the primary illegality was Officer Destro's attempt to coerce a *Miranda* waiver and a waiv-
er of the privilege against self-incrimination. Inasmuch as this difference might affect *Wong Sun* and *Brown* as precedents, we find it to be insignificant.

terrogation team remained the same. Under the circumstances, the passage of only three hours is insignificant, even when coupled with Collazo's unreported discussion with his wife. California underscores Mrs. Collazo's occupation as a *legal* secretary, implying that her vocation somehow dissipates any taint that might have resulted from Officer Destro's warning. We find her occupation of no value in deciding this case. Collazo was entitled to the presence of an attorney, not a legal secretary. The trial judge remarked, "I am not going to assume that a legal secretary is in any position to give him any advice as to his legal rights," an observation with which we agree. Collazo's past experience working *with* law enforcement is at best a neutral factor; in fact, it may have made him unusually susceptible to Officer Destro's exhortation to cooperate. Moreover, the police did nothing to erase their transgression.

Most importantly, however, a review of the tape and transcript of Collazo's alleged waiver and confession provide unmistakable evidence that no break in the causal chain or stream of events had occurred. Officer Rolen, Officer Destro's partner, opened the second exchange by referring explicitly to their earlier discussion. Then, in readvising Collazo of his *Miranda* rights, Officer Rolen asked Collazo if he remembered "all the rights we advised you of earlier," evoking their earlier exchange. Officer Rolen then went through the rights using mostly the past tense, i.e., "you *had* the right to remain silent," "anything you *said* could be and would be used against you," "you *had* a right to have a lawyer present with you and if you *couldn't* afford one, one would be hired for you by the County of Santa Clara." (emphasis added). Then Officer Rolen said, "And then I asked you if you understood all those rights. Do you understand all that—Okay. Now understanding all those rights and after talking with your wife and so forth, have you changed your mind now and do you want to talk to us?" To this, Collazo said, "Yes."

Thus, Officer Rolen in Officer Destro's presence explicitly tied the two encounters together. Proof of this actual linkage in Collazo's mind is found in his immediate response to Officer Rolen's recapitulation. The exchange continued as follows:

Q. Ok, ah, why don't you just go ahead and tell us what you want to tell us.

A. Ah, (sigh) I want to have a discussion with you guys, ah, ah, ah what is the—I'm going to tell you exactly what happened that day. Whatever, you know, I am going to tell you, ah, I know you know, my rights already. *Ah, I'm going to tell at the same time, ah, I would like to know what is the* (inaudible).

Q. *What is going to happen to you?*

A. Yes.

(emphasis added).

One can only conclude from this exchange, and especially from Collazo's question about what would happen to him, that Officer Destro's threats about things "going worse" for Collazo if he sought a lawyer and did not cooperate were a primary motivating factor in his about-face and decision to talk without counsel. When first advised of his rights, Collazo had no questions for the police about his fate. He wanted a lawyer, presumably to counsel him on that issue. But when told abruptly that negative things would happen to him if he secured the services of legal counsel, he responded—albeit three hours later—with an inquiry that gives every appearance of having been generated by Officer Destro's pressure.

Officer Rolen then properly declined to make any promises to Collazo in response to his inquiry, but in so doing he pointed out that there are "two sides to every story," strongly implying, as did Officer Destro in their earlier encounter, that if Collazo cooperated it might mitigate his predicament.

It is readily apparent from the historical facts that Collazo's "change of mind"—including his alleged *Miranda* waiver—was the direct product of the primary illegality in this case. Officer Destro's strategy was successful. Collazo caved in. There is nothing of substance to demonstrate other-

wise. There was "no break in the stream of events ... sufficient to insulate the statement from the effect of all that went before." *Clewis*, 386 U.S. at 710, 87 S.Ct. at 1340. Under the circumstances, Officer Rolen's readvice of rights and Collazo's alleged waiver thereof was an empty ceremony. Our analysis of this case confirms the general observation of Chief Justice Rehnquist in *Michigan v. Harvey*, 494 U.S. 344, 110 S.Ct. 1176, 1180, 108 L.Ed.2d 293 (1990), that "suspects who assert the right to counsel are unlikely to waive that right voluntarily in subsequent interrogations."

This case is not an example of the situation envisioned in *Edwards* when the Court carved out an exception for those suspects who "initiate" further discussion. Although the words and even the actions that could normally be construed as "initiation" were present at the outset of the second encounter, an analysis of the substance of the entire transaction—rather than the isolated form of the second encounter—demonstrates that Collazo did not "initiate" further conversation as that term is used in *Edwards*, or in Justice Rehnquist's plurality opinion in *Bradshaw*, 462 U.S. at 1045, 103 S.Ct. at 2834 ("initiation" of a conversation by a suspect may be found based on an *unbadgered* desire for a generalized discussion about the investigation). As demonstrated, Collazo's words and actions in calling back the officers and in "waiving" his rights were nothing less than the *delayed product* of Officer Destro's admonitory adventure three hours previously, and hence were "initiated" by the police, not by Collazo. " '[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing *only that he responded* to further police-initiated custodial interrogation even if he has been advised of his rights.' " *Bradshaw*, 462 U.S. at 1043, 103 S.Ct. at 2833 (emphasis added) (quoting *Edwards*, 451 U.S. at 484–85, 101 S.Ct. at 1884–85).

■ California does point to questions Collazo was asked after his confession and near the end of his encounter with the police regarding whether his statement was motivated by threats or promises. In context, his denial at the time that threats or promises had anything to do with his decision to talk can only be seen as itself the predictable harvest of Officer Destro's strategy. Collazo was asked about this by the prosecutor during the motion to suppress, and he gave an explanation we find credible:

Q. And you stated to them that they had not threatened you and they had— nor had they promised you anything; isn't that true?

A. Yes.

Q. And today, you are testifying that in fact, you did feel that they had threatened you?

A. Yes, sir.

Q. Okay. So at the end of that interview then, when you—the officers asked you if they had threatened you and you said no, you were lying to the officers; isn't that true?

A. I don't know what that means, you know, to you, *but when you are in that kind of a situation, you have to say yes.*

(emphasis added).

This is an appropriate case for application of the exclusionary rule, the purpose of which is " 'to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.' " *Brown v. Illinois*, 422 U.S. at 600, 95 S.Ct. at 2260 (quoting *Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960)). A more lenient approach would "simply invite the ingenious officer to invent new stratagems to produce colorable waivers of the right to counsel." *United States v. Rodriguez–Gastelum*, 569 F.2d 482, 488 (9th Cir.1978) (en banc) (Goodwin, J., concurring and dissenting).

V

■ Following submission of this case, the Supreme Court decided *Arizona v. Fulminante*, —— U.S. ——, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), holding that "harmless error analysis applies to coerced confessions." *Id.* 111 S.Ct. at 1257. In light of this development, we requested the parties

to the present case to file simultaneous briefs addressing the question of whether the use of Collazo's confession against him at trial, assuming it is found to have been involuntary, constituted harmless error. We have received the parties' briefs, and we now decide this issue.

The test for determining whether an error of Constitutional dimension was harmless comes from *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The *Chapman* test for excusing such error is whether the state has proved "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 24, 87 S.Ct. at 828. "To say that an error did not 'contribute' to the ensuing verdict is not, of course, to say that the jury was totally unaware of that feature of the trial.... To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Yates v. Evatt*, —— U.S. ——, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991).

We approach the record in this case with an awareness of the impact of a confession in a criminal trial.

A confession is like no other evidence. Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.... [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." [*Bruton v. United States*, 391 U.S. 123, 139–40, 88 S.Ct. 1620, 1629–30, 20 L.Ed.2d 476 (1968)]. While some statements by a defendant may concern isolated aspects of the crime or may be incriminating only when linked to other evidence, a full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely on that evidence alone in reaching its decision.

*Fulminante*, 111 S.Ct. at 1257–58 (omission in original) (citations omitted). As Justice Kennedy observed, "the court conducting a harmless-error inquiry must appreciate the indelible impact a full confession may have on the trier of fact, as distinguished, for instance, from the impact of an isolated statement that incriminates the defendant only when connected with other evidence." *Fulminante*, 111 S.Ct. at 1266 (Kennedy, J., concurring).

An examination of Collazo's taped statement reveals that it is indeed a detailed confession to conspiracy to rob Douglas Metzger and to burglarize the Metzger home. At one point in the interrogation, when Collazo was pressed on his intent and his purpose in confronting Metzger, he acknowledged his purpose was to rob Metzger of his "dope" and his money. This acknowledgment amounts to a complete confession to burglary, theft and robbery, and conspiring to commit those offenses. But, as California points out, Collazo's statement falls short of being a "confession" to murder. To constitute a confession, Collazo had to admit he was guilty of the crime of murder. California Jury Instructions Criminal ("CALJIC") 2.70 (1989 Revision). He made no such admission. In fact, the clear purpose of his statement was to assert he was innocent of murder because he fled the scene before his accomplice fired the fatal shot. It is apparent from his statement, however, that he was not conversant with either the felony murder rule or the vicarious liability that attaches under California law to co-conspirators. In California, a criminal conspirator is liable for "the natural and probable consequences of any act of a co-conspirator to further the object of the conspiracy, even though such act was not intended as a part of the original plan and even though he was not present at the time of the commission of such act." CALJIC 6.11 (1989 Revision).

Thus, Collazo's statement was tantamount to a confession to murder even though he may not have realized it at the time. In any event, the precise label placed on Collazo's statement vis-a-vis the murder

allegation is less important than what he said, and the probable impact of his statements on the jury.

California, in its supplemental brief, addresses the harmless error issue as follows:

> Appellant's defense [that he had withdrawn from the conspiracy before the killing] was inherently incredible and defies the application of logic. Appellant purportedly abandoned the conspiracy but yet continued to associate with the coconspirators only hours later. Furthermore, he went to the Metzger residence either personally armed or with knowledge that his newly-found coconspirator was armed with a firearm. If his true intent was merely to speak with the victim, Young's involvement and the display of a firearm conflicts with this purpose. The critical evidence used to establish appellant's culpability was not the challenged statement to the police. It was, instead, the prosecution's independent evidence of the conspiracy, the eyewitness testimony relating to appellant's actions at the Metzger residence, and the coconspirators' statement to appellant's wife that appellant went to the Metzger home to commit a robbery. Therefore, the admission of appellant's statements was harmless beyond a reasonable doubt.

California may be correct that Collazo's defense was "incredible," but we cannot agree that the "critical evidence used to establish appellant's culpability was not the challenged statement to the police." The prosecutor repeatedly punctuated his cross-examination of Collazo with references to the statement, and he pummeled Collazo with excerpts from it that were inconsistent with his statements at trial. The prosecutor relied extensively on the taped interview in attacking Collazo's testimony that he had abandoned all criminal intent before appearing at Douglas Metzger's house on the evening that Metzger was killed. Collazo testified that it was during an earlier visit to the house with Ricky Laureano that he began to change his mind. One passage from the cross-examination of Collazo suffices to illustrate this point:

Q When you talked to the police, I think you testified on direct that you lied to them in several areas; is that correct?

A Yes, sir.

Q And when you were interviewed by the police at the end of the interview, you swore to them that everything you said to them was true, didn't you?

A Yes, more or less was the truth. The only thing that I was holding was the involvement of Ricky. They have information on Ricky.

Q Well, at the end of your interview, did you tell Sergeants Rolen and Destro, "I swear to God this is more or less the truth?"

A No, sir.

Q You told them it was the truth, didn't you?

A Yes, sir.

Q And at the beginning of that interview, you told them, "I am going to tell you exactly what happened," isn't that correct?

A I think so, yes.

Q And at the time you told them this, you knew that they had arrested you for murder, did you not?

A Yes, sir.

Q And you didn't tell them that you and Ricky had been there earlier, did you?

A No, sir.

Q And they asked you about whether or not you were there earlier, didn't they?

A Yes, sir.

Q And you testified here in court that the reason that you did not tell them about Ricky and you being there earlier was to protect Ricky?

A Yes.

Q At the same time on that tape, didn't —strike that, at the same time during that interview, didn't you tell the police officers that you had been with Ricky earlier that day?

A Yes, sir.

Q And you gave them Ricky's name?

A Yes, sir.

Moreover, the prosecutor relied heavily in closing argument on Collazo's taped

statement. He did so in three respects. First, he used it to cement his own case: "I would submit to you, ladies and gentlemen, that there is more than sufficient evidence to find the defendant guilty of murder in the first degree.... You can base it [among other things] upon the statements to the police on the tape." Second, the prosecutor used the statement to attack Collazo's credibility as a witness: "And remember, remember Mr. Collazo's testimony from the witness stand and how that differs from the taped statement. In the tape, there is nothing about the door being opened and Doug Metzger lunging over him to get to the black man." Third, he used the statement to impugn directly Collazo's defense of abandonment: "The only way you could follow [defense counsel's] line of argument is if you wipe out all the circumstances behind this crime, if you wipe out this taped statement and you go strictly and purely upon his testimony on the stand...." The record is replete with similar examples of the effective use of the taped statement during both cross-examination and closing argument.

It is impossible to conclude from the foregoing as well as from the rest of the evidentiary record that Collazo's coerced statement did not contribute to his conviction. The taped statement as it was used by the prosecutor was clearly not "unimportant in relation to everything else the jury considered on the issue." *Yates v. Evatt*, 111 S.Ct. 1884. Thus, California has failed to sustain its burden of showing beyond a reasonable doubt that the admission in evidence of Collazo's statement and its use during the trial was harmless error.

## VI

Neither Collazo's request to talk to his interrogators, nor his alleged *Miranda* waiver, nor his custodial confession were voluntary, as that term applies either to the conduct of the police, or to Collazo's subjective reaction to police overreaching. To the extent that the state trial court's conclusions on these issues are inconsistent with this evaluation, we respectfully reject them as being without foundation in the record. Furthermore, we conclude the error in question was not harmless.

We reverse the district court's denial of the petition for writ of habeas corpus. The case is remanded to the district court to issue the writ and to determine a reasonable time in which the State of California shall retry the petitioner without using his taped statement, or release him.

REVERSED and REMANDED.

KOZINSKI, Circuit Judge, concurring:

There is much in both of the principal opinions with which I agree. The dissent clearly has the better of the argument on the purely factual question whether Collazo's confession was coerced. Were we deciding only that issue, I would have no difficulty concluding that Collazo knew exactly what he was doing when he asked to talk to the police the second time.

I come down on the side of the majority, however, because the Supreme Court has told us that voluntariness is not merely a fact-bound question whether this particular suspect's confession is the product of coercion, but also a legal question about whether the techniques the police used were tolerable. As the Court noted in *Miller v. Fenton*, 474 U.S. 104, 116, 106 S.Ct. 445, 452, 88 L.Ed.2d 405 (1985), "the admissibility of a confession turns as much on whether the techniques for extracting the statement, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne." The question before us, then, is whether the technique used here risks overcoming the will of the run-of-the-mill suspect, even if it did not overcome the will of this particular suspect.

So phrased, the question is capable of only one answer. As the Supreme Court said in *Edwards*, the police may not undercut the prophylactic rule of *Miranda* by refusing to accept a suspect's assertion of the right to counsel. *See Edwards v. Arizona*, 451 U.S. 477, 484, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981); *see also Minnick v. Mississippi*, — U.S. —, 111 S.Ct.

486, 490–91, 112 L.Ed.2d 489 (1991). The *Edwards–Minnick* line of cases "is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.'" *McNeil v. Wisconsin,* — U.S. ——, ——, 111 S.Ct. 2204, 2208, 115 L.Ed.2d 158 (1991) (quoting *Michigan v. Harvey,* 494 U.S. 344, 350, 110 S.Ct. 1176, 1180, 108 L.Ed.2d 293 (1990)); *see also Oregon v. Bradshaw,* 462 U.S. 1039, 1044, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983). We cannot allow police to advise suspects that they will pay dearly for taking advantage of their right to counsel precisely because some suspects will succumb to the pressure, even if this suspect did not.

This case is difficult only because *Edwards* allows an exception where the second round of questioning is initiated by the suspect. *See Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85. The dissent does a masterful job of showing that the *Edwards* exception might apply to Collazo because he initiated the second interrogation. In my view, however, the police forfeit the benefit of the *Edwards* exception once they use the type of pressure tactics demonstrated in this record. Because *Edwards* is designed to prevent police from badgering suspects into giving up their right to counsel, the narrow exception to *Edwards* cannot apply in a case where the police actually engaged in badgering. If police want to keep the *Edwards* escape hatch open, they must cease their interrogation as soon as the suspect asserts his right to counsel, and then hope he changes his mind on his own. Any other rule would invite police misconduct and enmesh the courts in the type of metaphysical unscrambling of which this case is a perfect example.

O'SCANNLAIN, Circuit Judge, with whom BEEZER and NOONAN, Circuit Judges join, dissenting:

To paraphrase the great Bard of Avon, "[t]he [majority] doth protest too much, methinks." W. Shakespeare, *Hamlet,* III, ii. In a noble attempt to vindicate important legal principles, my colleagues have misinterpreted and exaggerated the essential and dispositive facts of this case. More importantly, they have unjustifiably expanded the prophylactic rules that govern the waiver of an accused's constitutional rights to legal assistance and against self-incrimination. I therefore respectfully dissent.

I

A

In *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court held that "an accused ..., having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*" *Id.* at 484–85, 101 S.Ct. at 1884–85 (emphasis added). Elaborating upon the importance of this italicized language, which my colleagues now excise from the Court's holding, the Court wrote:

In concluding that the fruits of [a second] interrogation initiated by the police on January 20 could not be used against Edwards, we do not hold or imply that Edwards was powerless to countermand his election [to remain silent and to consult an attorney] or that the authorities could in no event use any incriminating statements made by Edwards prior to his having access to counsel. *Had Edwards initiated the meeting on January 20, nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial.* The Fifth Amendment right identified in *Miranda* is the right to have counsel present at any custodial interrogation. Absent such interrogation, there would have been no infringement of the right that Edwards invoked and there would be no occasion to determine whether there had been a valid waiver. *Rhode Island v. Innis,* [446 U.S. 291, 298 n. 2, 100 S.Ct. 1682, 1688 n. 2, 64 L.Ed.2d 297 (1980)], makes this sufficiently clear.

*Id.* at 485–86, 101 S.Ct. at 1885 (emphasis added).

Two years after *Edwards*, in *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), a plurality of the Court announced a two-part test by which to gauge the admissibility of a confession offered by a suspect after his invocation of the right to counsel. The confession is admissible, the Court held, if (a) the suspect initiates the discussion that leads to it and (b) the totality of the circumstances reveals that the purported waiver is both voluntary and intelligent. *Id.* at 1044–46, 103 S.Ct. at 2834–35 (plurality opinion); *see also id.* at 1048–50, 103 S.Ct. at 2836–37 (Powell, J., concurring in the judgment).

More recently, in *Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), in language that the majority surprisingly quotes and emphasizes, the Supreme Court held that in the wake of a request for counsel "it is presumed that any subsequent waiver *that has come at the authorities' behest, and not at the suspect's own instigation,* is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect." *Id.* at 681, 108 S.Ct. at 2097–98, *quoted ante* at 421 (with same emphasis added). Mirroring the more explicit language of *Edwards* and *Bradshaw*, *Roberson*'s tacit suggestion is that a subsequent waiver "at the suspect's own instigation" is not subject to such presumption.

Similarly, in *Minnick v. Mississippi*, —— U.S. ——, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), a recent decision wholly neglected by my colleagues, the Supreme Court held that when an accused requests counsel, "interrogation must cease, and *officials* may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." *Id.* 111 S.Ct. at 491 (emphasis added). Like

*Bradshaw* and *Roberson*, *Minnick* is a conscious and careful echo of *Edwards*. Writing for the Court in *Minnick*, Justice Kennedy repeatedly stressed that the prophylactic protection of these several rulings only extends to situations involving "police-initiated questioning." *Id.; see also id.* ("a fair reading of *Edwards* and subsequent cases demonstrates that we have interpreted the rule to bar *police-initiated* interrogation unless the accused has counsel with him at the time of questioning") (emphasis added); *id.* at 489 (" 'a valid waiver of th[e] right [to have counsel present during questioning] cannot be established by showing only that [the accused] responded to further *police-initiated* custodial interrogation ...' ") (quoting *Edwards*, 451 U.S. at 484, 101 S.Ct. at 1884) (emphasis added).

Indeed, the *Minnick* Court went out of its way to explain that *"Edwards* does not foreclose finding a waiver of Fifth Amendment protections after counsel has been requested, provided that *the accused* has initiated the conversation or discussions with the authorities; but that is not the case before us." *Id.* at 492 (emphasis added). I respectfully submit that what was not before the Supreme Court in *Minnick* is before this court today.

### B

Given that the Supreme Court itself has denied that *Edwards* compels the majority's holding, it is curious indeed for the majority to suggest that the officers' conduct represented a "textbook violation of *Edwards v. Arizona." Ante* at 417.[1] Even the majority admits that Collazo initiated the conversation that immediately led to his confession of guilt:

Collazo requested to talk to a lawyer. Instead of respecting his request, however, Officer Destro (Officer Rolen's

---

**1.** In Part III of its opinion, the majority discusses Collazo's initial conversation with the two officers. In Part IV, the majority discusses the second conversation, which Collazo himself initiated and during which he confessed. Significantly, the majority claims that a "textbook violation" of *Edwards* occurred during the *first* conversation, but that observation is a straw man in the context of this appeal because Collazo did not confess at that time. The majority does not contend that any violation of *Edwards* —textbook or otherwise—occurred during the second conversation. Rather, it creatively construes the facts to avoid confronting the reality that, because Collazo initiated the second conversation, *Edwards* and its progeny suggest that his confession may be admitted. *See infra* Part I–C.

partner) attempted to pressure him into dispensing with counsel and talking to them about the homicide....

The police then departed....

Collazo was then permitted to call and to see his wife, a legal secretary. She came to the police station and had a lengthy discussion with him, the substance of which is unknown. Some three hours after the officers' departure, Collazo contacted a sergeant and asked, "Where are the investigators?" The sergeant correctly construed this as a request to talk to them, and they were so notified and returned to the station. Collazo was again advised of his *Miranda* rights, and indicated he had changed his mind and was now willing to talk. He then essentially confessed to his non[-]shooting role in the crimes for which he had been charged and arrested.

*Ante* at 413–14 (footnote omitted).

Under a plain reading of these facts and the *Bradshaw* and *Edwards* rules, Collazo's confession was both voluntary and legally admissible in the case against him. After a three hour hiatus, during which time he had the opportunity to (and did) have "a lengthy discussion" with a trusted confidante, Collazo actively sought out the police officers who were investigating the Metzger homicide.[2] The officers, who had long since left the police station, were then summoned back upon his request. Once again, and notably without making any impermissible suggestions this time, the officers advised Collazo of his *Miranda* rights. Only after affirmatively acknowledging that he understood those rights *four times* and that he voluntarily had changed his mind, did Collazo confess.[3]

No one disputes that the officers' conduct during the *initial* conversation was improper and reprehensible. The issue, however, is whether that improper conduct *produced* Collazo's later confession. As the Supreme Court opined in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980):

> [I]t may be said ... that the [petitioner] was subjected to "subtle compulsion." But that is not the end of the inquiry. It must also be established that a suspect's incriminating response was *the product* of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response. This was not established in the present case.

*Id.* at 303, 100 S.Ct. at 1691 (footnote omitted and emphasis added). On the contrary,

---

**2.** The majority is undoubtedly correct in concluding that the right to have counsel present during an interrogation contemplates more than the assistance of a legal secretary—especially when the collective judgment of the accused and the secretary may be clouded by their having a spousal (or other non-legal) relationship. *See ante* at 421–22. That observation, however, would only be relevant if the issue before us were whether the police had honored Collazo's request for an attorney. Instead, the issue before us is whether Collazo voluntarily waived his rights and confessed his crime. "The voluntary or involuntary character of a confession is determined by a conclusion as to whether the accused, at the time he confesses, is in possession of 'mental freedom' to confess to or deny a suspected participation in a crime." *Lyons v. Oklahoma*, 322 U.S. 596, 602, 64 S.Ct. 1208, 1212, 88 L.Ed. 1481 (1944). The fact that Collazo "had a lengthy discussion" with a trusted confidante immediately before admitting his guilt—regardless of that confidante's legal know-how—is supporting evidence of such "mental freedom."

**3.** In a strained attempt to demonstrate evidence of coercion, the majority points out that Officer Rolen "opened the second exchange by referring explicitly to the[ ] earlier discussion" and then did not cleanly readvise Collazo of his *Miranda* rights because he "went through the rights using mostly the past tense...." *Ante* at 421–22. The majority, however, accurately describes the discussion immediately preceding the confession as follows:

> Then Officer Rolen said, "And then I asked you if you understood all those rights. Do you understand all that—Okay. Now understanding all those rights and after talking with your wife and so forth, have you changed your mind now and do you want to talk to us?" To this, Collazo said, "Yes."

*Ante* at 422. In my view, there is nothing "passive" about Collazo's waiver here and nothing peculiar about readvising a suspect of his rights while referring to a previous advisement in the past tense. Indeed, the tape of Collazo's confession reveals that during the second conversation the officers were extraordinarily patient and careful, asking and ensuring that the accused understood his rights four times before allowing him to proceed.

California carried its burden at the trial level of proving by a preponderance of the evidence that Collazo's waiver and confession were voluntary. *See Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986) ("Whenever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, the State need prove waiver only by a preponderance of the evidence."); *see generally Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). In fact, as the majority points out, "the trial court found Collazo's confession 'voluntary beyond a reasonable doubt,' and that there was 'no taint whatsoever to his ultimate statement.'" *Ante* at 415 n. 3 (quoting trial transcript).

Even if the state had not met its burden, however, the "totality of the circumstances" plainly reveals that Collazo voluntarily initiated the discussion during which he confessed and, further, that he initiated that discussion precisely in order to confess. *See Colorado v. Spring*, 479 U.S. 564, 573, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987) ("'Only if the "totality of the circumstances surrounding the interrogation" reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.'") (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979))). As a prior panel of this court observed:

Collazo had a prior criminal history, and was experienced in the routine of police interrogation. He was a paid informant of the DEA. There was a lapse of approximately three hours between the first interrogation session and Collazo's subsequent confession. Collazo conferred with his wife in the interim. Finally, at the time of his confession, Collazo stated that he was not acting under pressure of any promise or threat.

*Collazo v. Estelle*, 898 F.2d 87, 89 (9th Cir.1989), *reh'g en banc granted, id.* at 91. Collazo's familiarity with the legal process, his ability to consult his wife, his affirmation that he understood and yet still wished to waive his rights, the passage of a considerable period of time, and the complete absence of any evidence to suggest that he was acting under duress—when weighed together—demonstrate "a break in the chain of events sufficient to insulate the statement from all that went on before." *United States v. Patterson*, 812 F.2d 1188, 1192 (9th Cir.1987) (citing *Clewis v. Texas*, 386 U.S. 707, 710, 87 S.Ct. 1338, 1340, 18 L.Ed.2d 423 (1967)), *cert. denied*, 485 U.S. 922, 108 S.Ct. 1093, 99 L.Ed.2d 255 (1988).[4]

To borrow from the language of torts, a preponderance of the evidence indicates that Collazo's own free will was the "supervening cause" of his confession. Under such circumstances and where the accused, rather than the police, initiates the relevant discussion, *Edwards* and its progeny clearly indicate that a confession is properly admissible. Virtually all other circuits that

---

**4.** The *Patterson* court listed four factors that "have been identified [by the Supreme Court] as relevant to the issue of whether a statement *made after an involuntary statement* is voluntary." 812 F.2d at 1192 (emphasis added). The majority applies these four factors and concludes that "Collazo's alleged waiver and confession were not voluntary." *Ante* at 421; *see also ante* at 420–22. *Patterson*, however, is not directly on point: Collazo did not make any coerced, self-incriminating statements during his initial conversation with the police.

Nonetheless, I agree that the *Patterson* factors can inform our analysis here. I disagree, however, with the majority's conclusions under that analysis—particularly its conclusions that "the passage of only three hours is insignificant" and

that Collazo's previous experience with law enforcement "is at best a neutral factor." *Ante* at 421–22. In *Robinson v. Percy*, 738 F.2d 214 (7th Cir.1984), the Seventh Circuit found a valid waiver under the totality of the circumstances even though "only a couple of minutes elapsed between the [officer's] illegal questioning and [the accused's] own confession." *Id.* at 221. Similarly, in *United States v. Velasquez*, 885 F.2d 1076 (3d Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1321, 108 L.Ed.2d 497 (1990), the Third Circuit found a valid waiver where the accused, who had requested counsel only thirty minutes before, initiated further discussions and confessed only moments after a DEA agent lied to her in an effort to induce her to speak. The facts in neither of these cases are as compelling as the facts here.

have addressed this question have so concluded, and a district court within this circuit has agreed. *See United States v. Velasquez,* 885 F.2d 1076, 1083–89 (3d Cir. 1989) (suspect who initiated further discussion and confessed after first invoking *Miranda* rights effectively waived those rights), *cert. denied,* —— U.S. ——, 110 S.Ct. 1321, 108 L.Ed.2d 497 (1990); *Plazinich v. Lynaugh,* 843 F.2d 836 (5th Cir. 1988) (same), *cert. denied,* 488 U.S. 1031, 109 S.Ct. 841, 102 L.Ed.2d 973 (1989); *United States v. Comosona,* 848 F.2d 1110, 1112–13 (10th Cir.1988) (same); *Fike v. James,* 833 F.2d 1503 (11th Cir.1987) (same); *Robinson v. Percy,* 738 F.2d 214, 221 (7th Cir.1984) (same); *Fetterly v. Paskett,* 744 F.Supp. 966, 970–71 (D.Idaho 1990) (same); *cf. United States v. Gomez,* 927 F.2d 1530, 1539 (11th Cir.1991).

## C

The majority is only able to avoid this conclusion through a combination of dubious factfinding and wordplay that purportedly permits the court to say that Collazo did not really "initiate" the discussion that led to his confession.

First, the majority claims that there is an "evident linkage between the [initial] coercion and the [subsequent] confession." *Ante* at 420. In the majority's words, "we find ... that Collazo's initiation of the communication leading to the second interrogation was the product of the coercive statements made by the police during the first, illegal interrogation." *Ante* at 420. Appearing as it does for the first time in the long history of this case in the latter pages

of the majority's opinion, this purely factual finding is hardly believable. Indeed, in four previous decisions in this very case, the state trial and appellate courts, the district court, and a prior panel of this court all expressly found that there was no linkage—evident or otherwise—between the officers' initial comments and Collazo's later confession.[5] Again, as the majority concedes, the trial court found that Collazo's confession was "voluntary beyond a reasonable doubt." *See ante* at 415 n. 3; *see also Sumner v. Mata,* 449 U.S. 539, 546–47, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981) (in habeas proceedings, the factual findings of state trial and appellate courts are presumed correct if fairly supported by the record). Indeed, as the state points out, Collazo himself repeatedly affirmed at the time of his confession that his waiver was the product of his own free will, and the trial court agreed. My colleagues, however, dispense with that finding and substitute their own judgment, determining on the basis of a cold record that those affirmations are not credible but that Collazo's subsequent, counsel-guided testimony at the suppression hearing is. *See ante* at 429. Credibility determinations, though, are not the province of this court. We must accept those determinations as they appear in the record, and the majority is unable to demonstrate where in the record there is any affirmative evidence of their alleged "evident linkage." The facts simply do not support the finding.[6]

Moreover, the majority's characterization of the second discussion as a "second interrogation" is itself inappropriate: " 'Interro-

5. Some have argued that under such circumstances as these, federal courts should apply the holding of *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), to foreclose the collateral review of a state conviction altogether. *See Duckworth v. Eagan,* 492 U.S. 195, 205–14, 109 S.Ct. 2875, 2881–85, 106 L.Ed.2d 166 (1989) (O'Connor, J., with whom Scalia, J., joins, concurring).

6. The officers' comments during the first discussion were "coercive," but that does not mean that they necessarily resulted in "coercion." Collazo did not confess during the initial conversation. To link his later confession to the officers' earlier coercive comments requires some independent evidence of actual coercion. I submit that there is none and that the majority has not shown otherwise. The majority places critical weight on Collazo's concern, during the second conversation, with what might happen to him. *See ante* at 422. It seems wholly natural to me, however, for someone faced with such serious criminal charges to ask a police officer what fate may await him; the question is in no way indicative of an overpowered will. Nor do I regard the question as in any way referential to the prior conversation. The majority's conclusion that Collazo's query ineluctably and unmistakably demonstrates "actual linkage" escapes me. *Ante* at 422.

gation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Innis*, 446 U.S. at 300, 100 S.Ct. at 1689 (footnote omitted). "By custodial interrogation, we mean questioning *initiated by law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966) (emphasis added). Collazo initiated the second discussion and was not subjected to substantial pressures during that discussion before he actually confessed. Under similar circumstances, this court has held that a discussion may not be characterized as an "interrogation" for purposes of *Miranda*. *See Shedelbower v. Estelle*, 885 F.2d 570, 573 (9th Cir. 1989), *cert. denied*, —— U.S. ——, 111 S.Ct. 975, 112 L.Ed.2d 1060 (1991); *United States v. Thierman*, 678 F.2d 1331, 1334–35 (9th Cir.1982); *see also United States ex rel. Church v. DeRobertis*, 771 F.2d 1015, 1017–20 (7th Cir.1985); *Robinson v. Percy*, 738 F.2d at 218–19. Under similar circumstances, the Supreme Court has also suggested that *Miranda* rights may not even be implicated. *See Innis*, 446 U.S. at 298 n. 2, 100 S.Ct. at 1688 n. 2; *Edwards*, 451 U.S. at 485–86, 101 S.Ct. at 1885; *see also Arizona v. Mauro*, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987).

By declaring the existence of an "evident linkage" between the two discussions, the majority seeks to do with the facts what it clearly cannot do with the law: escape the unmistakable implication of *Edwards*, *Bradshaw*, *Roberson*, *Innis*, and *Minnick* that when the accused initiates the conversation, he may thereby render harmless prior police improprieties and render admissible subsequent incriminating statements. By holding, as a factual matter, that Collazo was acting under the undue influence of the officers' earlier comments when he later requested to speak with them, the majority concludes that Collazo did not actual-ly "initiate" the second conversation at all but that, in fact, the police did. *Ante* at 422. This cannot be believed, and as a result, neither can the court's holding that Collazo's confession was coerced.

This, then, is the critical flaw in the majority's analysis: Part III of the court's opinion presents a compelling but largely irrelevant survey of our *Miranda* jurisprudence and its underlying policy rationales only to conclude, in dicta, that the conduct of the police during the *first* conversation was not "compatible with a system of justice that does not permit police coercion" and typifies behavior that "offends due process as guaranteed by the Fourteenth Amendment." *Ante* at 416, 419–20. Part IV then attempts to resuscitate Part III, which is otherwise entirely dicta, by finding the all-important "evident linkage": the ethereal thread of coercion that ties the two conversations—and the two parts of the majority's analysis—together. The structure of the argument is inherently seductive. Surely no one disagrees with Part III and its broad affirmations of an accused's rights, but properly understood, Part III has no bearing on the specific facts or question before us.

In short, because there was no appreciable foul play associated with the incriminating second conversation and because Collazo himself initiated that conversation in order to confess, the majority's holding cannot stand unless one is able to impute the impropriety that occurred during the first conversation into the second one as well. This requires a finding of not one, but two involuntary acts on Collazo's part. First, one must find that Collazo's request to speak with the officers—after the three-hour hiatus and after the lengthy discussion with his wife—was itself coerced, and then one must find that his subsequent confession was also coerced. The facts support neither finding. Collazo affirmatively initiated the second conversation and voluntarily admitted his guilt.[7]

---

**7.** Having concluded that Collazo's waiver and subsequent confession were voluntary, I need not address the question of harmless error: the admission of a voluntary confession is by defini-tion not error, and where there is no error, there can be no harmful error. *But see Arizona v. Fulminante*, —— U.S. ——, 111 S.Ct. 1246, 1266–67, 113 L.Ed.2d 302 (1991) (Kennedy, J.,

## D

If the majority's misreading of the facts were my only complaint, this would be a briefer dissent. A view of police coercion as expansive as the majority's, however, has greater ramifications. If allowed to stand, the majority's holding will unjustifiably extend the current reach of *Miranda's* prophylactic protections. *See Connelly*, 479 U.S. at 166, 107 S.Ct. at 521 (cautioning against "expanding 'currently applicable exclusionary rules by erecting additional barriers to placing truthful and probative evidence before state juries'") (quoting *Lego*, 404 U.S. at 488–89, 92 S.Ct. at 626).

The "unless" clause in the *Edwards* holding, the qualification in the *Roberson* holding, the very essence of the *Bradshaw* and *Innis* holdings, and the careful caveat in *Minnick*—which all suggest that *suspect*-initiated discussions may produce admissible confessions in the wake of police improprieties—are at risk of becoming dead letters within this circuit. If a court can find upon these facts that the accused did not "initiate" the relevant discussion and did not voluntarily confess thereafter, then one wonders under what conditions a confession in the wake of prior police misconduct will ever be admissible in court. In short, the majority's holding goes a long way toward establishing the proposition that police misconduct creates a per se violation of *Miranda* that subsequent voluntary acts of the accused can never render harmless. *See United States v. Anderson*, 929 F.2d 96, 99 (2d Cir.1991) ("the application of a *per se* rule is inappropriate"). Because *Miranda* is a prophylactic rule—and not a constitutional right—such a proposition of law has no rationale to recommend it. *See ante* at 418 (acknowledging that "*Miranda* 'rights' are 'not themselves rights protected by the Constitution'") (quoting *Michigan v. Tucker*, 417 U.S. 433, 444, 94 S.Ct. 2357, 2363, 41 L.Ed.2d 182 (1974)); *see also Roberson*, 486 U.S. at 688–93, 108 S.Ct. at 2101–04 (Kennedy, J., dissenting).

concurring in the judgment) (concluding that confession was not coerced but, reaching harmless-error issue in light of majority's contrary

## II

Courts must be wary of exaggerating what are properly recognized as contemptible improprieties into grandiose visions of injustice. The temptation to entertain such visions is especially great in cases that pit lonely criminal defendants against the police and prosecutorial powers of their state governments. The danger in succumbing to such temptation is that rules designed to secure the integrity of the legal process can gradually take the form of escape valves whose only notable effect is to provide safe haven for indisputably guilty persons. *Cf. Fulminante*, 111 S.Ct. at 1264 (holding that even the admission of a coerced confession may be harmless error and noting that "'the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence'") (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986)); *see also Robinson v. Borg*, 918 F.2d 1387, 1394 (9th Cir.1990) (Trott, J., dissenting) (warning against the dangers of expansive judicial applications of the *Miranda* rules and urging the judiciary "to monitor carefully the costs of these rules as they are applied to the cases that come before us").

In my view, that is precisely what has happened in this case and what could happen to this court's *Miranda* jurisprudence generally. Through a dramatic envoy, our thoughtful bard once warned:

> We must not make a scarecrow of the law,
>
> Setting it up to fear the birds of prey,
>
> And let it keep one shape till custom make it,
>
> Their perch, and not their terror.

W. Shakespeare, *Measure for Measure*, II, i. The majority has rallied behind such a straw man here, and I therefore earnestly hope that the tenure of today's ruling as the law of this circuit will be short-lived.

holding, concluding that its admission was not harmless error).

**434**

GOODWIN, Circuit Judge, (dissenting separately):

This case is en banc because a majority of our active judges believed that an important Sixth Amendment question, the right to counsel, may have been incorrectly dealt with by all the other courts, including our original panel, that have examined the question.

In the state court system the primary focus appears to have been on the question of Fifth Amendment voluntariness. The most troublesome question now is whether Collazo called the officers back on his own motion, or because he felt "pressured" by Officer Destro to do so. In this connection, the majority's footnotes carry most of the burden.

For example, footnote 2 says that California admits that "pressuring" is an appropriate characterization of Officer Destro's tactics. I agree, but that leads to the next footnote.

Footnote 3 sets up the state trial court's merger of the Fifth and Sixth Amendments and helps to explain the resulting confusion. The state court listened to the tapes, found the confession "voluntary beyond any reasonable doubt," and then disposed of the right-to-counsel issue with the throw-away line that there was "no taint whatsoever to his ultimate statement."

Footnote 8 takes up the heart of the matter: Did Destro's "pressuring" cause Collazo to change his mind about wanting a lawyer? That is what this case is about.

Footnote 5 answers the question left open in footnote 8. It holds that the pressure mentioned in footnote 2 carries over and taints Collazo's statements.

Reasonable minds can and do differ about when a federal court should say as a matter of law that the state courts were wrong in their voluntariness analysis. As far back as *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), in the separate opinion of Mr. Justice Black, we find the doctrine emerging that the federal courts should "reexamine the facts to be certain that there has been no constitutional violation, and our inquiry ... can-

not be cut off by fact findings at the trial level." 378 U.S. 368 at 408, 84 S.Ct. 1774 at 1797.

Reasonable minds can and do differ about whether a federal court should say as a matter of law that the state courts were wrong in applying *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), to this case. The state trial court and reviewing courts found in effect that Collazo initiated the second conversation and was not coerced into giving up his right to counsel.

It is not clear, however, that the state courts focused on this question. The majority finds that the state courts were wrong, and that Destro's remark tainted Collazo's later conversations. The case boils down to the question of "taint."

I have come to the conclusion that in this case, the state trial court probably reached the right result for the wrong reason. Collazo knowingly called back the officers, not because he was "menaced" or coerced, but because he apparently thought he could improve his situation by appearing to cooperate. I doubt that Collazo was brooding for three hours about how much worse off he would be with a lawyer than without one. Collazo is an informer who made the perpetrator's common mistake of thinking he could outsmart the police by telling them his side of the story.

I am content to take his taped confession at face value. There is no possibility in this case of an innocent man spending time in jail because of the overriding of his will by the comment of Officer Destro. Accordingly, I would vote to affirm the denial of the writ.