**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 24-10309

————————————

WINSTON CALDER,

*Petitioner-Appellant,*

*versus*

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

*Respondent-Appellee.*

————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:23-cv-60762-RKA

————————————

Before HULL, MARCUS, and WILSON, Circuit Judges.

MARCUS, Circuit Judge:

Winston Calder appeals the denial of his petition for habeas corpus, brought pursuant to 28 U.S.C. § 2254. Calder was convicted in Broward County, Florida, for murder in the first degree on February 17, 2015, and sentenced to life in prison. The resulting

case has given rise to a lengthy and byzantine set of trial, appellate, and collateral attack proceedings. Central to the State's case was a confession obtained on January 21, 2008 (the "Statement"), which, although not admitted into evidence, was used extensively by the State to impeach Calder's testimony at trial. In the instant federal petition -- originally raised as an amended state motion for post-conviction relief under Florida Rule of Criminal Procedure 3.850 -- Calder claims his trial counsel was prejudicially ineffective for failing to challenge the Statement under *Strickland v. Washington*, 466 U.S. 668 (1984). The district court rejected Calder's petition, finding de novo that his trial counsel was not ineffective because any objection to the Statement as being coerced was doomed to fail.

After careful review, we agree with the district court that Calder is not entitled to relief under § 2254, but for different reasons. In denying Calder's petition, the district court determined that under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), no prior state court had adjudicated Calder's *Strickland* claim on the merits, thus warranting de novo review. As we see it however, the State's postconviction response brief (the "State's Response"), expressly adopted by the state postconviction court, argued that no matter what became of Calder's Statement, Calder was not prejudiced by any error his trial counsel may have committed. Under our controlling law, this finding by the state postconviction court amounts to an adjudication on the merits of Calder's *Strickland* claim, and therefore we are required to review Calder's petition only through the prism of AEDPA deference. Because the state adjudication that Calder was not prejudiced by his

trial counsel's alleged error is neither contrary to nor an unreasonable application of federal law, we affirm.

## I.

These are the essential facts and procedural history.

"On January 20, 2008, during an argument in which his girlfriend, Georgia Lee, tried to remove him from their apartment, Calder shot and killed Lee.  Police arrested Calder the following day." *Calder v. State* (*Calder I*), 133 So. 3d 1025, 1027 (Fla. 4th DCA 2014).  Upon arrest, Calder recounted in some detail the events that precipitated Lee's killing.  The description below covers, first, the exchange between Calder and the police leading up to the Statement, before dissecting the details of the Statement itself, and the winding proceedings that followed.

### A. Initial Interrogation

Calder was arrested at around 1:00 AM on January 21, 2008, and was transported to the station of the Lauderhill Police Department.  Upon his arrival, he was interrogated by Detective Rick Sessions.

At the start of the interrogation, Detective Sessions asked Calder a series of basic questions about his background and pedigree.  Calder stated that he grew up in Jamaica and had been living in the United States for nearly a year.  Calder also confirmed that although he had been drinking that weekend, he was sober at the time of the interrogation.  Detective Sessions explained that Calder was under arrest "for the incident that happened on Saturday

night" and provided Calder with a sheet of paper containing a numbered list of *Miranda* warnings, an affirmation that the defendant understood each of the rights, and a signature block waiving the right to counsel and agreeing to speak without a lawyer present.[1] After the detective explained the warnings, Calder indicated he understood his rights, but asked for clarification on "number three." Detective Sessions responded, "Number three says . . . if you decide to answer questions now without a lawyer present, you will have the right to stop questioning at any time and speak with a lawyer." Calder then said, "Like number three now with a lawyer present. I -- me would prefer lawyer."

---

[1] The sheet of paper included the following numbered warnings:

> 1. You have the right to remain silent; 2. Anything you say can be used against you in a court of law; 3. If you decide to answer questions now without a lawyer present, you will still have the right to stop questioning at any time and speak with a lawyer and have one present during questioning if you wish; 4. If you cannot afford a lawyer, one will be appointed to represent you before any questioning if you wish.

Following the numbered warnings, the paper's written waiver, located just above the signature block, reads this way:

> I, _____, have read this statement of my rights, or have had it read to me and I understand what my rights are. I am willing to make a statement and answer questions. I do not wish an attorney at this time. No threats or promises have been made to me. No pressure of any kind has been used against me, nor have I been deceived into giving this statement. I understand and know what I am doing.

24-10309                Opinion of the Court                        5

As the Fourth District Court of Appeal (the "Fourth DCA") later recounted, the exchange continued, and Detective Sessions repeatedly confirmed that Calder had requested a lawyer. *Calder I*, 133 So. 3d at 1028. Detective Sessions then got up to leave the room. Before departing however, Detective Sessions said the following:

> [I]f you do change your mind and you do want to talk to me about your side of the story, okay, what I need you to do is -- knock on the door but knock kind of loud, just knock on it kind of loud, I'll come back in and then if you say you know what, Detective Sessions, I really, it really would make me feel better if I got the opportunity to give my side of the story, talk about what happened on Saturday, I know what happened, okay? I know that it's very difficult for you and it's going to be tough for you to sleep because the bottom line is you been through a tough situation and nobody wants to be in your shoes, obviously, but at the same time one of the things that makes somebody feel a lot better is if they get the opportunity to get things off of their chest, it kind of clears their mind, it clears their conscious [*sic*] and it makes them feel better, you know.

*Id*. at 1028–29. With that, the detective left Calder alone in the interrogation room.

Calder began to cry, and soon thereafter (seven or eight minutes later) asked to speak to Detective Sessions again. Detective Sessions re-entered the room and said, "Hey Winston, what's

going on, Bud?"  Calder told Detective Sessions, "[G]o get the paper, I sign it."  Detective Sessions said, "You wanna talk [to] me about what happened?"  Calder replied, "Yeah.  Yeah."  After confirming that Calder wanted to speak without a lawyer present and that Calder could read and write in English, Detective Sessions presented Calder with the paper listing the *Miranda* warnings and offering a written waiver.  Calder signed the waiver at 4:35 AM.

## B. Calder's Statement

In Calder's recorded statement to Detective Sessions, he offered the following explanation of the events that unfolded that fateful night.  Calder said he was involved in an intimate relationship with Lee, but the two had been arguing in the weeks before the altercation.  Calder added that Lee had changed, and that she had become upset with him for being controlling and jealous.

On Saturday, January 19, 2008, Lee threw a birthday party for Calder.  Many people attended.  At the time of the party, Lee was no longer Calder's girlfriend or, in his words, she was only "partially" his girlfriend, though the two were living together in an upper unit at an apartment complex identified as "The Villas."[2]  On the floor below Lee and Calder's unit was a vacant apartment.  When the party started, most of the guests were outside on the lawn behind the two apartments.

---

[2] Lee had several children who lived in the apartment, and had also lived in the apartment with her brother, Michael Green, for a few months before Calder moved in.

During Calder's birthday, a "special friend" of Lee's came to the party. Lee then stopped helping with the party and began visiting with him. Calder confronted Lee about who the friend was, and the two began to argue. At some point it started to rain, so Calder and his friends moved the food and speaker system upstairs to Lee's apartment. As the party continued, Calder realized that Lee had left, and had not helped move the food inside. Calder thought Lee was trying to embarrass him in front of his friends, though he did "no[t] really feel embarrassed."

After the party guests left at around 4:00 AM, Lee returned to the apartment. When Calder confronted her, Lee told Calder he "did not have any manners," and the two started to argue. Lee then began to pack Calder's clothes. Calder relayed that he then left the apartment and went downstairs to the empty unit below. While downstairs, Calder retrieved a gun from the vacant unit. As he returned outside, Calder saw Lee putting his clothes and other belongings outside the front door of her apartment. Just before, Calder's friend, Patrick Johnson, had arrived. Although he couldn't be sure, Calder surmised that Lee called Johnson before the fight escalated.

Calder went back upstairs to join Lee and Johnson. He asked Lee why she had placed his things outside. Calder then tried to force his way through the front door. This caused Lee and her brother, Michael Green, who was already inside, to brace the door. Lee and her brother also started to kick and punch Calder in an effort to repel him. During the scuffle, Green "thump[ed]" Calder

in the face several times.  Lee also flung something at Calder, which he believed was a small vase.  After Green hit Calder in the face again, Calder pulled the firearm out of his pocket.  By Calder's own account, he reached around the door, aimed the gun inside, and fired a blind shot.  The shot struck and fatally wounded Lee.  Calder explained that the shooting was in self-defense and that although he knew Lee was behind the door, he did not know exactly where she was.  After firing the shot, Calder left the apartment.  He said that only later did he learn that Lee had been killed.  He claimed he did not intend to kill Lee.

### C. First Trial and Subsequent Appeal

In a one-count indictment, a grand jury sitting in Broward County charged Calder with first-degree murder.  The case proceeded to trial in 2011.  Prior to trial, the state court denied Calder's motion to suppress the Statement, finding that he had voluntarily reinitiated his conversation with Detective Sessions after requesting a lawyer, and that therefore there was no *Miranda* violation.  The Statement was admitted as direct evidence, and Calder was convicted by the jury.  *Calder I*, 133 So. 3d at 1027.

On direct appeal to the Fourth DCA, Calder asserted that the police had obtained his Statement through an involuntary waiver.  *Id.* at 1029.  Specifically, he argued "the detective's persistent attempts to persuade him to 'tell his side of the story' amounted to improper interrogation that vitiated the voluntariness of his subsequent waiver." *Id.*  The Fourth DCA agreed, reversing Calder's conviction and remanding for a new trial.  *Id.* at 1033.  In

so doing, the appellate court determined that Calder unequivocally invoked his right to counsel. *Id.* at 1030. Next, it found that the detective's continued interrogation "failed to scrupulously honor Calder's invocation of his right to counsel." *Id.* at 1030–31. The court noted, however, that "Calder himself initiated communication with the detective after having invoked his right to counsel." *Id.* at 1031. Thus, the court asked "whether, under the totality of the circumstances, Calder's confession during the second interrogation was voluntary." *Id.* The Fourth DCA answered this question in the negative, explaining that "[Calder's] action in requesting the detective was merely the delayed product of the coercive police conduct." *Id.* at 1032–33 (citation modified) (first citing the Ninth Circuit's opinion in *Collazo v. Estelle*, 940 F.2d 411, 419–24 (9th Cir. 1991) (en banc)[3]; then citing *State v. Brown*, 592 So. 2d 308, 308–09 (Fla. 3d DCA 1991)). The court reasoned that because "the officer's improper comments . . . were designed to induce [Calder] to reinitiate the communication without a lawyer," the "totality of the circumstances shows that Calder's reinitiation of the interrogation" was "the product of improper police conduct." *Id.* at 1033. The court then remanded the case for a new trial, concluding that the

---

[3] In *Collazo*, the Ninth Circuit held that the defendant's confession was involuntary where the defendant asked to talk to a lawyer, but the police warned him that speaking to a lawyer "might be worse" for him. *Collazo*, 940 F.2d at 420, 423. The *Collazo* court reasoned, as did the Fourth DCA in *Calder I*, that the exchange rendered the defendant's waiver involuntary. *Id.* *Collazo* was not just a *Miranda* case. The Ninth Circuit expressly reached a "two-part conclusion," finding that the confession was involuntary in violation of both *Miranda* and the Due Process Clause. *Id.* at 419.

admission of Calder's Statement was not harmless error.  *Id.* at 1033.

### D. Second Trial

Calder's case was again tried to a jury over the course of seven days in February 2015.  At the second trial, Calder took the stand in his own defense.  He recounted a story that differed in substantial ways from the Statement he gave to the police.  He testified that on January 19, 2008, he got off work and returned to The Villas at 5:30 PM.  While setting up for the party, he discovered a gun as he was cleaning out the vacant lower apartment.  He placed the gun in his pocket for "safekeeping."  During the party, Calder noticed Lee was missing, and spied Lee on the opposite side of the complex with one of her children, talking with an unknown man.

Calder approached the pair and introduced himself.  He stated that seeing Lee with another man made him "a bit upset," and he took Lee's child with him when he turned to leave.  Lee followed Calder and asked for her child back, saying Calder didn't "have any manners."  Eventually, and at the urging of Calder's neighbor Desmond Hendricks, Calder gave the child back to Lee.  Lee returned to the apartment, and Calder went back to the party downstairs.

After it began to rain, Calder and several guests started moving the food from the party up to Calder's apartment.  Calder testified that Lee then told the guests that the party was over.  After the guests departed, Calder went to Lee's room to ask why she had ended the party.  She refused to give him a straight answer, at

which point Green returned to the apartment. Calder described Lee as being "really, really mad" at the time, and so he left her in the bedroom. Calder went out to the patio to "cool off," and contemplated leaving the shared apartment. He walked down the stairs and went around to the complex's parking lot, thinking he could perhaps depart and find a hotel.

At that point Calder received a call from Johnson, who had arrived moments before. Johnson was upstairs by the entrance to Calder's apartment, and called down to Calder that there were several bags that appeared to be filled with his belongings placed outside the apartment, presumably by Lee. Calder saw this as further reason to leave the apartment, but when he went to retrieve his items, he noticed several important documents were missing. Calder then entered the apartment to search for the documents, where he saw Lee packing more of his belongings. He grabbed the documents and went outside and down to his truck.

Calder stowed his documents and went back up to the apartment to gather the rest of his belongings. When he got there, he passed Johnson before running into Lee and Green in the apartment's hallway. Calder then testified that some kind of liquid was flung at his face. He claimed he was ambushed by Johnson and Green, who, along with Lee, began to hit him. Blinded and surrounded, he tried to back away. But, as Johnson blocked his path, he was unable to get away. Calder testified that he thought his life was threatened, and he pulled the gun from his pocket to scare his assailants. He claimed that he managed to back up until he was

near the entrance of the apartment, pinned between the wall and the front door, at which point he fired the weapon.

On direct examination, Calder first explained that he "fired the gun to scare them off," but then said that he didn't mean to shoot the gun at all. Rather, the gun was fired accidentally after he was forced back; he wasn't aiming at anyone. Calder then fled the scene. He later learned that Lee had been shot.

At the start of its cross-examination, the State confronted Calder on the particulars of his story of when and how the shooting occurred. Through a lengthy demonstration, it sought to confirm where Calder was in the apartment in relation to his would-be attackers during the scuffle. Once the alleged facts were in place, the State assailed Calder's credibility with, among other things, the observation that his account could not be reconciled with the forensic evidence at the scene. Thus, for example, the State observed that from Calder's recounting, it wasn't possible for Lee to have been shot in the way that she had been -- with the bullet entering the right side of her head -- nor could Lee's body have been found the way it was, propped up against the apartment's front door. Moreover, the State asked Calder why Johnson, Calder's "best friend of 30 years," had suddenly joined in the attack. Finally, though it did not squarely address the contradiction, the State confirmed that Calder volitionally fired a blind shot to scare his attackers, rather than discharging the weapon accidentally.

Later in its cross-examination, the State shifted its focus and impeached Calder with the contents of his Statement to Detective

Sessions. In painstaking detail, the State went over many discrepancies between the two accounts, insisting that pursuant to Calder's Statement, he was angry at Lee for having a "special friend" at the party, they had fought right after the party, and he had fired the gun while trying to force his way into the apartment.

In its own case in chief, the State produced substantial evidence of Calder's guilt wholly independent from the Statement. For one thing, the State introduced physical evidence, including the gun Calder fired and expert testimony on the trajectory of the bullet. The State also offered testimony from numerous witnesses recounting the events of that night. The most critical testimony came from Green and Johnson, who were present when the shot was fired. Both gave accounts that flatly contradicted Calder's trial testimony. Among other things, they explained that Calder and Lee had been fighting, that Lee had forced Calder out of the apartment, and that in the moments before the fatal shot was fired, Calder was outside the apartment trying to force his way in, when he reached around the semi-open front door to fire the weapon at Lee, who was inside the apartment.

The jury returned a verdict of guilty on the count of first-degree murder.

### E. Postconviction Proceedings

#### i. Motion for New Trial and Direct Appeal

Following his conviction, Calder moved for a new trial. His lawyer complained about the use of Calder's Statement to Detective Sessions, asserting that the trial court "erred in allowing the

state to argue in closing the Defendant's statement [w]as substantive evidence when it was not admitted into evidence." At a hearing on the motion, counsel asserted that since the Statement had previously been suppressed, it should have been used only for impeachment purposes, and that the State crossed the line in attempting to use it as substantive evidence.

The trial court disagreed, observing that "even if it comes back on appeal that it should not have been admitted because of *Miranda* violations, the statement can still be used for impeachment purposes." Moreover, the trial court pointed out that the defense did not argue that the Statement had been coerced, noting that "Mr. Calder never alleged that he was physically beaten or something like that." It then denied Calder's motion. On direct appeal, the Fourth DCA affirmed Calder's conviction in an unexplained per curiam decision. *Calder v. State* (*Calder II*), 224 So. 3d 232 (Fla. 4th DCA 2017) (per curiam). The only issue raised on appeal was whether the trial court erred when it allowed the State to show the jury gruesome photographs.

### ii. Petition for Belated Appeal

On April 17, 2017, Calder, proceeding pro se, filed a petition "for a new appeal" pursuant to Florida Rule of Appellate Procedure 9.141 in the Fourth DCA, claiming the ineffective assistance of his appellate counsel. He alleged that appellate counsel failed to challenge on appeal the State's use of the Statement, because no hearing had been held in the trial court on the Statement's

voluntariness. The Fourth DCA summarily denied the petition on July 10, 2017.

### iii. Rule 3.850 Motion for Postconviction Relief

Soon thereafter, on October 23, 2017,[4] Calder filed still another collateral attack on his conviction pro se -- an amended motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 in the trial court. Rule 3.850 allows "a person who has been tried and found guilty or has entered a plea of guilty" to move for "relief from judgment or release from custody" under certain circumstances, including if "[t]he judgment was entered or sentence was imposed in violation of the Constitution or laws of the United States or the State of Florida." FLA. R. CRIM. P. 3.850(a). The second ground raised in the motion alleged that trial counsel was ineffective for failing to request a hearing in the first instance, on whether the Statement to Detective Sessions was coerced. Calder alleged that "[a]t no time prior to the prosecution using the January 21, 2008 statement against the defendant, did counsel request a hearing, outside the presence of the jury, on the issue of the voluntariness of the defendant's . . . statements." He further alleged that his counsel knew, or should have known, that the Statement

---

[4] Calder filed an initial postconviction motion under Rule 3.850 on June 5, 2017. He then filed an amended postconviction motion in October 2017 for relief under the same rule. The amended motion is stamped October 16, 2017, though the document's metadata and Calder's brief both say it was filed October 23, 2017. The disparity in the dates is of no moment here, because the amended motion was timely filed.

was coerced in violation of the Due Process Clause, given the scope of the Fourth DCA's opinion in *Calder I*.

In opposition to Calder's motion, the State's Response mistakenly said that Calder had raised this very issue before, even though his earlier petition only alleged the ineffective assistance of *appellate* counsel. It further insisted that usage of the Statement was proper, as a confession obtained in violation of *Miranda* could be used to impeach a testifying defendant. Finally, and independently, the State argued that any error was not prejudicial, since the State's evidence was compelling enough that Calder could not show a reasonable probability of a different outcome absent the use of the Statement. On March 29, 2022, the state postconviction court denied the Rule 3.850 motion "[f]or the reasons stated in the State's response." The Fourth DCA summarily affirmed. *Calder v. State* (*Calder III*), 350 So. 3d 347 (Fla. 4th DCA 2022) (per curiam).

### iv. Federal Habeas Petition

On April 24, 2023, Calder filed the instant pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the Southern District of Florida. Calder's petition rested on eight grounds, including that trial counsel was ineffective in failing to request a hearing on whether the Statement was coerced ("Ground Two"). In reviewing Ground Two, the district court observed that the State's Response, which was the operative document for discerning the reasoning of the two state courts, failed to distinguish between an objection on *Miranda* grounds, which would exclude the Statement as direct evidence, and one on due process grounds, which would

exclude its use for any purpose. The district court reasoned that since the State's Response had misconstrued Calder's claim, no adjudication on the merits was rendered. Reviewing the matter de novo, however, the district court concluded that trial counsel was not ineffective for failing to object. The court explained that because the state trial court found the Statement to be voluntary in denying Calder's motion for a new trial, and because Calder never offered any explanation why his Statement was coerced beyond the *Miranda* violation itself, any objection by counsel would have been futile. Thus, the district court denied Calder's habeas petition.

This timely appeal ensued; we granted review only on Ground Two, and assigned Calder counsel.

## II.

We review a court's denial of a petition for habeas corpus de novo, "ow[ing] no deference to the district court's decision about the state court's decision." *Brewster v. Hetzel*, 913 F.3d 1042, 1051 (11th Cir. 2019); *see also McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005). Further, "[a]n ineffective assistance of counsel claim is a mixed question of law and fact that [this] [C]ourt reviews de novo." *Jones v. Campbell*, 436 F.3d 1285, 1292 (11th Cir. 2006) (citing *Dobbs v. Turpin*, 142 F.3d 1383, 1386 (11th Cir. 1998)).

Section 2254 allows a state prisoner to petition a federal court for a writ of habeas corpus, provided the petitioner contends his custody is in violation of federal law. *See* 28 U.S.C. § 2254(a). In affording relief under § 2254, a federal court is sharply limited by AEDPA. The statute permits federal relief for claims first

adjudicated on the merits by a state court only if the underlying adjudication:

>    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* § 2254(d)(1)–(2). AEDPA imposes a "highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citation modified) (first quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); then quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). However, if no adjudication on the merits is rendered by the state court, "the claim is reviewed de novo." *Reaves v. Sec'y, Fla. Dep't of Corr.*, 872 F.3d 1137, 1151 (11th Cir. 2017) (quoting *Cone v. Bell*, 556 U.S. 449, 472 (2009)).

### III.

#### A.

Ground Two of Calder's habeas petition claims that his trial counsel rendered ineffective assistance by failing to object to the Statement's use even for impeachment purposes on due process grounds at the second trial. To establish an ineffective assistance of counsel claim, a petitioner must "demonstrate both that (1) 'counsel's performance was deficient,' and (2) 'the deficient

performance prejudiced the defense.'" *United States v. Webb*, 655 F.3d 1238, 1258 (11th Cir. 2011) (per curiam) (quoting *Strickland*, 466 U.S. at 687). As for the first prong, we assess counsel's performance with an eye for "reasonableness, not perfection." *Brewster*, 913 F.3d at 1056 (citing, inter alia, *Strickland*, 466 U.S. at 687). This requires an "objective inquiry" into counsel's performance, and "because counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc) (citing, inter alia, *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc)).

Even if trial counsel was ineffective, the petitioner must also establish that such error was prejudicial. *See Strickland*, 466 U.S. at 693 ("[A]ctual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice."). To prove prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Brewster*, 913 F.3d at 1052 (quoting *Strickland*, 466 U.S. at 694). Where the proffered error is the "failure to object . . . we ask whether there is a reasonable probability of a different result if counsel had objected." *Id.* "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

In reviewing Ground Two of Calder's habeas petition de novo, the district court addressed only the first *Strickland* prong, concluding that Calder's trial counsel was not ineffective for failing to challenge the Statement. The court reasoned that "counsel couldn't have been ineffective for failing to argue that the . . . Statement was involuntary because the state court came to the opposite conclusion," citing the state trial court's observation that Calder "never alleged that he was physically beaten or something like that." Moreover, the district court opined that Calder never explained why, other than pointing to *Miranda* itself, the Statement had been coerced.

Calder insists that the district court erred. He cites the Fourth DCA's decision in *Calder I*, contending the state appellate court's holding amounted to a dual finding that the Statement was involuntary under *both Miranda* and the Due Process Clause of the Fourteenth Amendment. From this, he infers that the district court's conclusion that the Statement was voluntary rather than coerced was erroneous, for if the state appellate court issued a contrary holding, that holding would constitute binding law of the case, mandating the Statement's exclusion. *See Owen v. State*, 862 So. 2d 687, 694 (Fla. 2003) (per curiam) (explaining that under Florida's law of the case doctrine, "all questions of law which have been decided by the highest appellate court become the law of the case which must be followed in subsequent proceedings, both in the lower and appellate courts" (quoting *Brunner Enters., Inc. v. Dep't of Revenue*, 452 So. 2d 550, 552 (Fla. 1984))).

We need not decide, however, whether Calder is correct, because even if we assume that *Calder I* sweeps as broadly as he claims, and therefore that his trial counsel was ineffective for not raising an objection, his petition must nevertheless be denied because he cannot establish that this error was prejudicial. As we have observed, it is hornbook law that in order to prevail on an ineffective assistance of counsel claim, a defendant must satisfy both prongs of *Strickland*. *See Strickland*, 466 U.S. at 687. Indeed, "there is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*. at 697. An analysis under *Strickland* may "begin with either of [its] two components," *Brewster*, 913 F.3d at 1051–52 (citing *Strickland*, 466 U.S. at 697), and "[a] court may decline to reach the performance prong of the ineffective assistance test if convinced that the prejudice prong cannot be satisfied," *Dallas v. Warden*, 964 F.3d 1285, 1306 (11th Cir. 2020) (quoting *Waters*, 46 F.3d at 1510).

This approach makes sense in the instant case. AEDPA requires a federal habeas court to defer to a state court's adjudication on the merits. As we explain, the two state courts only adjudicated the question of prejudice on the merits. Prudentially, it would be strange indeed to bypass the merits decision issued by the state courts, and assess instead a different matter de novo, especially where the merits decision is dispositive. Moreover, the question of ineffectiveness is arguable. The matter requires a difficult predictive analysis into whether an objection on due process grounds may have succeeded, and such a prediction is complicated by the

ambiguity found in *Calder I*.[5]  Accordingly, we need only answer whether the state courts' merits determination that there was no prejudice was contrary to or an unreasonable application of federal law as determined by the Supreme Court.  After a searching review of the record, and applying the deferential lens of AEDPA, we conclude the answer is no.

*B.*

We are satisfied that the state courts adjudicated the prejudice question on the merits.  When a state court does not explain the reasons for its decision, we are required to "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning," unless the State

---

[5] The parties fiercely dispute the scope of *Calder I*'s holding, and with good reason.  On a cursory review, it is unclear how broadly the Fourth DCA intended its holding to sweep.  After all, the Fourth DCA did say, expressly, that the Statement was obtained through "coercive police conduct."  *Calder I*, 133 So. 3d at 1032–33.  The court also cited with approval *Collazo*, a case in which the Ninth Circuit issued a dual finding of involuntariness under both *Miranda* and the Due Process Clause.  940 F.2d at 420, 423.  On the other hand, if *Calder I* meant to issue a holding beyond *Miranda*, the opinion is subtle.  The Fourth DCA never cited the Due Process Clause -- indeed, it never used the words "due process" at all.  The mention of coercion, moreover, is not dispositive, as voluntariness is also a requirement under *Miranda*.  *See Berghuis v. Thompkins*, 560 U.S. 370, 382–83 (2010) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).  And finally, the procedural posture of *Calder I* suggests that the Fourth DCA had no occasion to comment on the applicability of the Due Process Clause, since the appeal arose only from the state trial court's holding that the Statement was admissible under *Miranda*.  *See Calder I*, 133 So. 3d at 1029.

24-10309              Opinion of the Court                    23

gives reason to think otherwise. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). The Fourth DCA offered no reason or rationale when it summarily affirmed the state postconviction court's denial of Calder's Rule 3.850 motion. *Calder III*, 350 So. 3d at 347. The state postconviction court itself also issued a summary order, but explained that it denied the matter "[f]or the reasons articulated in the State's response." Thus, in order to discern the state courts' reasoning in their review of Calder's motion, the State's Response becomes the operative document. *Wilson*, 584 U.S. at 125; *see also Bilotti v. Fla. Dep't of Corr.*, 133 F.4th 1320, 1327 (11th Cir. 2025) (per curiam).

Calder contends, nevertheless, that the State's Response did not resolve Ground Two on the merits because it failed to address whether the use of the Statement for impeachment purposes violated the Due Process Clause. In this, Calder is only partially correct. Although the State's Response misconstrued the nature of Calder's claim as to why counsel's performance was allegedly deficient, it directly addressed the second prong of prejudice. It reasoned this way:

> [T]he Defendant is unable to demonstrate prejudice to the extent that it rendered the verdict unreliable. In the instant case, there was strong direct evidence proving [Calder] committed the crimes charged in the Indictment including testimony of the victim's brother who was an eye witness to the crime and [Calder being] in possession of the murder weapon at the time of his arrest. Accordingly, there is no reasonable probability of a different outcome in this case.

It is undeniable that the State's Response, plainly adopted by the state postconviction court and affirmed without further explanation by the Fourth DCA, concluded that even if the Statement had been expressly challenged on due process grounds, and even if the Statement was excluded for all purposes at the trial, the corpus of evidence presented by the State still would have lead to a guilty verdict. This is an adjudication of prejudice on the merits. *See Raulerson v. Warden*, 928 F.3d 987, 1000 (11th Cir. 2019) ("[A] decision that does not rest on procedural grounds alone is an adjudication on the merits regardless of the form in which it is expressed." (quoting *Wright v. Sec'y for Dep't of Corr.*, 278 F.3d 1245, 1255–56 (11th Cir. 2002))). And it must be afforded deference under AEDPA.[6] The remaining question, then, is whether the state

---

[6] Notably, for some § 2254 cases predicated on a claim of ineffective assistance, the degree of deference given is heightened. The Supreme Court has explained that since "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,'" "when the two apply in tandem, review is 'doubly' so." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). Double deference does not apply in this case, however, as here *Strickland* and § 2254(d) do not "apply in tandem." *Id.* *Strickland* deference only applies to a court's assessment of counsel's performance. *See, e.g.*, *Raheem v. GDCP Warden*, 995 F.3d 895, 928 (11th Cir. 2021); *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1262 (11th Cir. 2016). As one judge on our Court has written, "[u]nlike the performance evaluation, which asks us to assess what counsel did or did not do . . . the prejudice question is, in the end, a legal one. There is no 'what' to analyze." *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1334 (11th Cir. 2013) (en banc) (Jordan, J., concurring) (citing *Strickland*, 466 U.S. at 688). Because "[t]here is only the ex post legal determination . . . as to whether the defendant was or was not prejudiced by his

24-10309                Opinion of the Court                25

courts' determination was contrary to or an unreasonable applica-
tion of federal law.  We hold that it was not.

## C.

To unseat the state courts' finding that the trial evidence was
enough to convict him without the Statement, and thus that any
error on the part of trial counsel was not prejudicial, Calder again
must show that the state adjudication "was contrary to, or involved
an unreasonable application of, clearly established Federal law," *id.*
§ 2254(d)(1), or otherwise "resulted in a decision that was based on
an unreasonable determination of the facts in light of the evidence
presented in the State court proceeding," *id.* § 2254(d)(2).

For AEDPA purposes, "clearly established Federal law" "re-
fers to the holdings, as opposed to the dicta, of [the Supreme]
Court's decisions as of the time of the relevant state-court deci-
sion." *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams v.
Taylor*, 529 U.S. 362, 412 (2000) (plurality opinion)).  A decision is
"contrary to" Supreme Court precedent if it rests on a "rule that
contradicts the governing law set forth in [the Court's] cases," or
involves "a set of facts that are materially indistinguishable from a
decision . . . and nevertheless arrives at a result different from [its]

---

counsel's actions," a court does not apply the *Strickland* layer of deference to
the prejudice inquiry.  *Id.* (citing *Wiggins v. Smith*, 539 U.S. 510, 534 (2003);
*Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993)).  And since the only applicable
adjudication on the merits in this case involves prejudice, we apply one layer
of deference to Calder's claim, applicable to all adjudications on the merits
under AEDPA.

precedent." *Williams*, 529 U.S. at 405, 406. Alternatively, under the "unreasonable application" clause, a state court's decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

Here, Calder argues that because the Statement was used extensively to impeach him when he testified in his own defense, and was also featured in the State's closing argument, the evidentiary picture given to the jury was fatally tainted. He surmises that because the State spent "[h]alf of its questioning" focusing on the Statement, including "impeach[ing] [him] with the Statement at least 35 times and refresh[ing] his recollection with it at least 19 times," the State heavily relied on the Statement to color the evidence.

To be sure, the Statement's use in impeaching Calder may have been effective. There were substantial differences between the Statement and the testimony Calder supplied during the second trial, including how the altercation began, and how Lee was shot. Nevertheless, the state adjudication that Calder would have been found guilty anyway is not reversible under AEDPA. At the outset, the decision was not "contrary to" controlling federal law -- in this case, *Strickland*. Through the State's Response, the state postconviction court held, and the Fourth DCA affirmed, that Calder would have been convicted anyway based on the compelling trial evidence. That finding is a straightforward application of *Strickland*'s second prong, which asks whether a defendant can show a

"reasonable probability" of a different outcome. *Strickland*, 466 U.S. at 694; *Brewster*, 913 F.3d at 1052. In finding that Calder failed to meet this standard, the state courts did not misapply *Strickland* -- they issued a finding precisely within the bounds of prong two.

Moreover, the state courts' decision did not involve an "unreasonable application" of *Strickland*. To show an unreasonable application of federal law, a state prisoner seeking habeas relief "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Here, in finding Calder's claim lacking under prong two of *Strickland*, the state courts did not misapply federal law -- rather, they found that Calder's claim for relief was inadequate under the correct standard. It makes no difference that, under prong one of *Strickland*, the state courts adopted analysis that misconstrued Calder's ineffective assistance of counsel claim. Because both prongs are necessary for relief, the state courts were entitled to rest their decision on either one, and weren't required to make a finding on prong one in the first place.

Finally, the state adjudication did not "result[] in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Although Calder contends that the Statement's exclusion would "dramatically alter[] the balance of the evidence before the jury," the state courts concluded that in light of

the State's evidence, the exclusion would not have produced a reasonable probability of a different outcome.

Applying AEDPA deference, unless the state courts' evaluation of the evidence was "so obviously wrong that its error lies beyond any possibility for fairminded disagreement," their conclusion should be upheld. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1041–42 (11th Cir. 2022) (en banc) (quoting *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (per curiam)). The evidentiary picture in the absence of the Statement is not so skewed as to meet this extraordinary showing, and any reasonable jurist could readily reach the same conclusion offered by the two state courts.

First, even without the Statement, the State had plenty of ammunition to confront, rebut, and undermine Calder's credibility on the stand, as it did. On direct examination, Calder's story had many gaps and inconsistencies that cast real doubt on the reliability of his narrative. Thus, for example, his story was murky as to how, exactly, the gun went off. He first said that he fired the weapon himself to scare his assailants. After being pressed by his lawyer however, he shifted course, and said he "never intentionally pull[ed] the trigger," but instead the weapon went off because he instinctually "gripp[ed] on something" while being attacked. He also did not explain why, even though he said his argument with Lee was restrained and nonviolent, he was suddenly ambushed by Lee, Green, and Johnson -- his own childhood friend who had arrived only moments before. If Calder's prior behavior had been truly innocuous, it is unclear why this sudden escalation occurred.

Moreover, on cross-examination, the State questioned the deficiencies in Calder's story outside its use of the Statement. The State pointed out that Calder changed his story as to who was beating him when the gun fired, where Lee was in relation to Calder when she was shot, and confirmed that Calder again "fire[d] to scare [his attackers] off," in flat contradiction to his earlier story that the gun went off only accidentally, not by volition. The State also suggested that given the location of Calder's body in relation to the door and Lee, Lee could not have been struck the way she was -- with a bullet lodged in the side of her head. Finally, the State cross-examined Calder as to why Johnson, Calder's "best friend of 30 years," participated in the attack. After all, the day following the alleged skirmish, Calder contacted and visited Johnson without incident, despite his supposed role in ambushing Calder. Although the State relied on the Statement to impeach Calder as to the details of his story, then, there were plenty of other threads that the State pulled at -- and could expand on in greater detail without the Statement -- that would unravel Calder's narrative before the jury.

Second, the State's case in chief was compelling. The State presented testimony from two witnesses, Green and Johnson, who testified against Calder and contradicted his story. Between them, the State's witnesses supplied a full account of who was where, and when: Green was inside the apartment with Lee when the fatal shot was fired, and Johnson was outside the apartment with Calder. Both testified as to substantially the same events leading up to the shooting: that neither ambushed Calder, but instead that Lee was bracing the front door to prevent Calder, who was agitated

following a fight with Lee, from entering the apartment. Both explained that Calder had been forced out of the apartment because he and Lee had been involved in a heated argument, which turned physical. This is why Johnson was called in the first place -- Lee had warned him that Calder was turning violent, and needed him to help cool Calder down.

The two testimonies also aligned on much of the specifics. Johnson testified that after he arrived, he followed Calder and Lee into one of the apartment's bedrooms, where Calder physically fought Lee. After Johnson pulled Calder off of Lee, Calder left with Johnson and then re-entered the apartment. Green confirmed that Calder again pushed Lee several times as she was packing his belongings, prompting her to throw liquid into his face and push him out of the apartment. Lee tried to close the door, but Calder kept his foot in the jam. Johnson was outside with Calder, while Lee held the door against him, but slipped on the liquid, falling to the ground and keeping her back to the door. Crucially, both Johnson and Green confirmed that when Calder couldn't force the door open again, he pulled out the gun and reached around the front door with his right arm, firing the gun at Lee. Green also remembered that at first the gun didn't go off, so Calder had to try again after removing the safety. After the shot, Calder fled and Johnson called Lee's phone, which Green answered. Johnson then told Green to call the police.

The testimony supplied by Green and Johnson was separately corroborated by the physical evidence at the scene. The

State called Dr. Khalil Wardak, an associate medical examiner and forensic pathologist, as an expert witness to testify as to the cause and manner of Lee's death. He explained that at the scene, Lee's body was laying up against the door, blocking entry. She was oriented with her back to the door, and Dr. Wardak observed a wound "on the right side of the frontal part of the head." After an autopsy where he recovered the bullet and x-rayed Lee's skull, Dr. Wardak determined that the trajectory of the bullet indicated that Lee was "standing back against the door, pushing the door to close" when she was shot. He surmised that her wound was caused by a hand reaching around the door, and firing a shot inward. This again reinforced the State's narrative, that Lee was trying to close the door and keep Calder out when she was shot.

The evidence supplied by the State thereby confirmed, through eyewitness testimony and expert assessment, the bulk of the State's theory against Calder: that Calder and Lee had fought, that Calder was forced out of the apartment by Lee, and that when the shot was fired, Calder was attempting to force his way back into the apartment, and he fired around the front door to hit Lee. This evidence did not rely on the Statement, but independently confirmed Calder's guilt. On this record, we cannot say the state courts were unreasonable in finding that, whether or not the

Statement was excluded, Calder would have been adjudged guilty of first-degree murder.[7]

Congress enacted AEDPA for the purpose of "reduc[ing] delays in the execution of state and federal criminal sentences," *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (citing *Williams*, 529 U.S. at 386), and to "further the principles of comity, finality, and federalism," *id.* (quoting *Williams*, 529 U.S. at 436). In limiting habeas review when a state court has adjudicated a claim on the merits, AEDPA "give[s] the State a first opportunity to consider most matters and to insist that federal courts properly respect state-court determinations." *Cullen v. Pinholster*, 563 U.S. 170, 206 (2011) (Breyer, J., concurring in part and dissenting in part).

These principles instruct us that the state adjudication should be respected in this case. A reasonable jurist could readily conclude, as the state postconviction court and Fourth DCA did, that the evidence was sufficient to establish Calder's guilt even without the Statement, and thus that Calder's asserted error was not prejudicial. The state courts' decision is not subject to reversal

---

[7] It makes no difference that the jury considered lesser included offenses, including second-degree murder and manslaughter. The same evidence that supported Calder's guilt specifically confirmed that he acted with malice, and not accidentally or out of self-defense. Indeed, Calder did not contest that Lee had been shot; his sole theory at the second trial was that he did not mean to shoot her, and so conviction for a lesser offense was proper. It is precisely this theory that the State disproved with its case in chief. Thus, for our purposes, it is sufficient to say that the state courts were not unreasonable in determining that Calder would have been convicted of the same offense for which he was charged -- murder in the first degree -- even if his Statement was excluded.

24-10309                Opinion of the Court                33

under AEDPA, and Ground Two of Calder's petition must be denied.

**AFFIRMED.**